## STATE of Maine

### v.

### Wayne CASHMAN and Robert Lizotte.

Supreme Judicial Court of Maine.

Feb. 15, 1966.

Bernard R. Cratty, County Atty., Augusta, for plaintiff.

Warren E. Belanger, Fairfield, Charles N. Nawfel, Waterville, for defendants.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN, RUDMAN, and DUFRESNE, JJ.

WEBBER, Justice.

On exceptions to the refusal of the presiding justice to direct a verdict for the respondents. Trial by jury was upon an alleged violation of 17 M.R.S.A., Sec. 3701 which provides in part: "Whoever makes,

publishes or sends to another any communication, written or oral, containing a threat to injure the person or property of any person shall be punished, etc."

One Gilman, sole witness for the State, testified that he was served with a subpoena to appear before the Grand Jury "to give evidence of what you know relating to a complaint now pending * * * against Robert Lizotte and Wayne Cashman * * * for the crime of Forgery and Uttering Forged Instrument." Some time later and before his appearance in answer to the subpoena, he received a telephone call during the course of which he conversed with a person whose voice he recognized as that of respondent Lizotte. Gilman received another telephone call during which he talked with respondent Cashman. The witness stated that he and the respondents were well acquainted. Each respondent testified and admitted that he had a criminal record but denied categorically that the conversations related by Gilman ever occurred.

The gist of these two conversations (and of this case) is contained in the following excerpts from Gilman's testimony:

"He (Lizotte) said that he and Wayne would be kind of mad if I said anything about either one of them having anything to do with the checks, if I said anything in court against them. * * * And he said they both have a lot of friends in Waterville and if anything should happen *they would take care of me. * * *.*

He (Cashman) said to me that I had better not say anything about him or Robert (Lizotte) that would get them into trouble or that would put them in jail and that there was a lot of guys they know real well and they would hate to see him 'go back up river', as he put it, and that if he had to go it would not be for one year, it would be for a period of years and that *they would see that I was taken care of.*" (Emphasis ours.)

The jury could find that these conversations occurred substantially in the form as related by the witness. The issue is then whether or not the quoted language constitutes an oral threat within the meaning of the statute. We have as yet had no occasion to define the word "threat" as used therein.

The word which most often appears in any definition of "threat" is "menace." Wharton's Criminal Law and Procedure, Vol. III, Sec. 1398, page 796 states: "This threat may consist in a menace of destruction or of injury to person, character, or property. It may be either oral or in writing. No precise words are necessary in order to constitute a threat amounting to blackmail. Such a threat may be by innuendo or suggestion, and the circumstances under which the threat is uttered and the relations between the parties may be taken into consideration. The threat must also be such as would ordinarily create alarm." The definition of "threat" given by 22 Am.Jur. 239, Sec. 20 is in very similar terms.

Words which in one context might be harmless and innocuous become menacing under other circumstances. Thus threats to "get a rope" when uttered by members of a mob constituted a threat to one who had reason to believe that the mob intended to cause him great bodily injury. State v. Wilbourn, (1934) 219 Iowa 120, 257 N.W. 571.

Holding that a threat may be made by telephone, the court in State v. Boyer, (1963) 2 Conn.Cir. 288, 198 A.2d 222, 225, said in part: "A threat imports the expectation of bodily harm, thereby inducing fear and apprehension in the person threatened. A threat, unlike an assault, is not limited by time or distance. It is equally vicious whether made vis-a-vis or over a wall or across a stream, or whether it is uttered by the unaided voice or over a megaphone or is amplified through a loudspeaker. A threat is always an indication of probable evil to come, whether at once

or at some certain or uncertain time in the future; and the lingering or uncertainty of the menace, particularly when voiced through a faceless telephone, is apt to cause greater fear and dread than if the threat was made face to face by an adversary who could be held to immediate accountability."

In the instant case the threat must be found, if at all, in the words "they would take care of me" and "they would see that I was taken care of." Such expressions may be completely devoid of menace under some circumstances and pregnant with the promise of evil in a different setting. Here the phrasing was designed to induce fright and alarm and thereby to prevent the giving of testimony which might have undesirable consequences from the point of view of these respondents. It matters not that the threatened action might be accomplished by unnamed friends or associates of the respondents rather than directly by themselves. It is hardly likely that such friends or associates would imperil their own safety by committing unlawful acts merely to avenge the respondents except with the latters' consent and at their request. This was no mere warning or prediction as to matters outside the control of the respondents. See NLRB v. Teamsters, Chauffeurs, Etc., Local 901, etc., (1963) 1 Cir., 314 F.2d 792, 794. The prosecuting witness knew the respondents. The jury could properly conclude that these expressions, when used by persons whose familiarity with the vocabulary of the criminal element was more than casual and whose motivation was the frustration of the judicial process, could be well understood by Gilman as menacing his person and property and imposing a heavy price upon the performance of his duty as a citizen. It was as though the respondents had said in more formal and less colloquial terms: "Beware! You testify against us before the Grand Jury at your peril! If we suffer any consequences from such testimony, neither your life nor your property will be safe from our vengeance by the hands of our friends!" The threat was real. The promise of evil consequence was effectively conveyed. The evidence, if believed, would support a conviction of the crime proscribed by the statute. The sole issue was the credibility of the witnesses, a matter peculiarly within the province of the jury. There was no occasion to direct a verdict for the respondents.

Exceptions overruled.

Judgment for the State.