677 So.2d 1211 (1995)
Kevin Dion CONKLE
v.
STATE.
Cr-93-2020.
Court of Criminal Appeals of Alabama.
April 14, 1995.
Rehearing Denied July 28, 1995.
Certiorari Quashed May 24, 1996.
*1212 Curtis Rosser, Centre, for Appellant.
Jeff Sessions, Atty. Gen., and Jack Willis, Asst. Atty. Gen., for Appellee.
Alabama Supreme Court 1941732.
McMILLAN, Judge.
The appellant, Kevin Dion Conkle, was convicted in district court of harassment, a violation of § 13A-11-8(a)(1)(b), Code of Alabama 1975. He was sentenced to 90 days' imprisonment in the county jail; the sentence suspended for two years on the following conditions: that the appellant not violate any state, federal, or municipal laws during the period of suspension and that he not have any contact with the prosecuting witness. Additionally, he was ordered to pay a $25 fine.
Included in the record is a "Certification of Questions of Law" submitted by the trial court to this court pursuant to Rule 30.2(2), Ala.R.Crim.P., following the trial court's determination of guilt. Within that certification, the trial court set out the facts presented in this case and submitted certain questions of law to this court concerning solely verbal threats. The following is the "Certification of Questions of Law":
"A. Statement of Facts

*1213 "On June 21, 1994, Defendant, Mr. Conkle, was tried in district court and adjudged guilty of directing abusive or obscene language toward the prosecuting witness, Ms. Beverly Maxwell, in violation of § 13A-11-8(a)(1)(b), Code of Alabama 1975 (1979).
"At the time of the alleged incident, Mr. Conkle was involved in a matter with the Cherokee County Department of Human Resources (DHR) regarding Mr. Conkle's alleged behavior toward his juvenile daughter. At trial, Mr. Conkle testified that he believed Ms. Maxwell to be the person responsible for DHR's intervention in his life. Ms. Maxwell testified that she had knowledge that Mr. Conkle had accused her of reporting him to DHR in that matter. Ms. Maxwell testified that, on the date of the incident, she arrived at a local country convenience store and began pumping gas into her automobile at a time when Mr. Conkle was using a public phone at the side of that convenience store. She testified that when Mr. Conkle finished with his phone call, he drove between the gas pumps of the convenience store, slowed down or stopped, rolled down his window, stared at her, said: `I'm going to get you, little girl. You're as good as dead,' and drove off. Upon cross-examination, Ms. Maxwell testified that she was frightened by Mr. Conkle's words but that Mr. Conkle's words did not at any time cause her to want to hit Mr. Conkle or to fight with him. No physical action on the part of Mr. Conkle was alleged by the State or testified to by Ms. Maxwell merely the words quoted above. No present intent or ability to carry out the alleged words was alleged by the State, testified to by Ms. Maxwell, or evident from the circumstances or facts of the case; on the contrary, Ms. Maxwell testified Mr. Conkle drove off after uttering the alleged words.
"Following the presentation of evidence by the State, Mr. Conkle moved the court for a Judgment of Acquittal. As grounds, Mr. Conkle, citing Robinson v. State, 615 So.2d 112 (Ala.Crim.App.1992), wherein the Alabama Court of Criminal Appeals held that the words `abusive or obscene language' contained in § 13A-11-8(a)(1)(b), Code of Alabama 1975 (1979), apply only to `fighting words,' noted that the State had failed to show that the words alleged to have been spoken by Mr. Conkle had provoked a desire to hit or fight in Ms. Maxwell but rather, if anything, had shown that Mr. Conkle's alleged words had only frightened or scared Ms. Maxwell. The motion was denied by the court.
"Mr. Conkle testified that after he finished with his phone call, he drove between the gas pumps at the convenience store, saw Ms. Maxwell pumping gas, looked at her momentarily without stopping, and drove away. Ms. Conkle, a passenger in Mr. Conkle's car and his fiancée at the time of the incident, testified and corroborated Mr. Conkle's testimony.
"At the end of trial, a Motion for Judgment of Acquittal was again made and denied. The court found Mr. Conkle to have uttered the words as testified to by Ms. Maxwell and on the basis of that finding adjudged him guilty of Harassment as defined in § 13A-11-8(a)(1)(b), Code of Alabama 1975 (1979).
"B. Questions of Law
"1. Given the Alabama Court of Criminal Appeals' ruling in Robinson v. State, 615 So.2d 112 (Ala.Crim.App.1979 [1992]), wherein the Court construed the words `abusive or obscene language' as contained in § 13A-11-8(a)(1)(b), Code of Alabama 1975 (1979), to apply only to `fighting words,' do the words `I'm going to get you, little girl. You're as good as dead.' constitute `fighting words' under the circumstances and facts of this case?
"2. Do the words `I'm going to get you, little girl. You're as good as dead.' constitute `abusive or obscene language' as contained in § 13A-11-8(a)(1)(b), Code of Alabama 1975 (1979), under the circumstances and facts of this case?
"3. Assuming arguendo Mr. Conkle had intended to frighten or scare Ms. Maxwell by uttering the words as alleged, does the mere fact of uttering the alleged words with nothing more for the purpose of frightening or scaring constitute Harassment *1214 as defined by § 13A-11-8(a)(1)(b), Code of Alabama 1975 (1979)?
"4. Has the State proven the necessary elements of Harassment, § 13A-11-8(a)(1)(b), Code of Alabama 1975 (1979), under the circumstances and facts of this case?
"I certify the four questions of law presented above are correctly stated and are the appropriate questions for review upon appeal in the above-styled case.
"Done this Wednesday, August 17, 1994."
In his brief on appeal, the appellant argues that the trial court erred in finding him guilty of harassment. Specifically, he alleges that the State failed to prove that the words he used against the prosecuting witness were "fighting words." Robinson v. State, 615 So.2d 112, 113 (Ala.Cr.App.1992). Thus, the questions raised by this case are whether the verbal threat made by the appellant, which was not accompanied by any physical conduct, constituted harassment and, further, whether such a verbal threat, without more, can constitute a crime in this State under the present laws.
The First Amendment to the United States Constitution promises that "Congress shall make no law abridging the freedom of speech." However, over the past 200 years, the United States Supreme Court has:
"`permitted restrictions upon the content of speech in a few limited areas, which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." We have recognized that "the freedom of speech" referred to by the First Amendment does not include a freedom to disregard these traditional limitations.'"
Jeffrey M. Laurence, Minnesota Burning: R.A.V. v. City of St. Paul and First Amendment Precedent, 21 Hastings Const. L.Q. 1117 (Spring 1994), quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 381-85, 112 S.Ct. 2538, 2542-43, 120 L.Ed.2d 305 (1992). Thus, freedom of speech has been curtailed for certain limited purposes, including prohibiting libel, slander, perjury, conspiracy, and treason.
"The right to free speech is valuable insofar as it enables the speaker to participate in a dialogue. Outside the context of a dialogue, a speaker's right to speech becomes only an empty right to talk. It is, therefore, most helpful to distinguish between `context in which talk leaves room for reply and those in which talk triggers action or causes harm without the time or opportunity for response.'"
Aviva O. Wertheimer, The First Amendment Distinction Between Conduct and Content: A Conceptual Framework for Understanding Fighting Words Jurisprudence, 63 Fordham L.Rev. 793 (December 1994) (citations omitted).
A line of cases has emerged from the United States Supreme Court creating the doctrine of "fighting words," which proscribed certain classes of speech in order to prevent potentially violent conduct.
"Some fifty years ago, the Supreme Court established the doctrine of `fighting words,' which limited the `license to talk' when the chosen words took on the force of violent aggression that was likely to result in retaliatory conduct. The basic principle of the doctrine was that, under certain circumstances, communications apart from the content of their message take on a hostile, fighting quality that makes the communications more likely to engender violent consequences. In defining a category termed `fighting words,' the Court wrote that `[t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or `fighting' wordsthose which by their very utterance inflict injury or tend to incite an immediate breach of the peace.'
"In establishing the fighting words doctrine, the Court determined that when a speaker's words do not contribute to dialogue or the expression of ideas, but are instead intended to provoke harmful conduct, they have no value as instruments of *1215 `speech.' Therefore, they may be regulated without contravening the First Amendment. While `speech' is protected under the Constitution, words that do not promote dialogue or the exchange of ideas are instruments of something other than speech. Depending on the context and circumstances behind the communications, a speaker's words may have nothing at all to do with the exercise of the constitutional right to freedom of speech.
"Ultimately, however, the Court designed fighting words as a category of speech wholly unprotected by the First Amendmenteven though the fighting words doctrine is only incidentally related to speech. The Court understood fighting words to be a form of conduct, or `verbal acts,' analogous to conduct that is likely to have violent consequences. From its inception, the premise underlying the doctrine was not the restriction of certain words, but the prevention of instances when those words are used to provoke breaches of the peace."
Id., 63 Fordham Law Review at 794-95. Initially, the United States Supreme Court held that "fighting words" were not truly a form of communication and therefore were not safeguarded by the Constitution and that further punishing such speech as a criminal act would raise no constitutional question.[1] See Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). In carving this exception to the freedom of speech, the Supreme Court's goal was to prevent breaches of the peace. "Speech can only be prohibited if it is `directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'" Barbara Hoffman, Law For Art's Sake in the Public Realm, 16 Colum.-VLA J.L. and Arts, 39 (Fall 1991), quoting Texas v. Johnson, 491 U.S. 397, 409, 109 S.Ct. 2533, 2542, 105 L.Ed.2d 342 (1989). See also Feiner v. New York, 340 U.S. 315, 319-20, 71 S.Ct. 303, 305-06, 95 L.Ed. 295 (1951), and Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), in which the United States Supreme Court defined "fighting words" as those which "by their very utterance inflict injury or tend to incite an immediate breach of peace." Id., 315 at 572, 62 S.Ct. at 769. "These include the lewd and the obscene, the profane, the libelous, the insulting or `fighting' wordsthose which by their very utterance inflict injury or tend to incite an immediate breach of peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived by them is clearly outweighed by the social interest in order and morality." Id.
It is clear that the determination of whether words in a particular case constitute "fighting words" must be determined on a case-by-case basis in light of the surrounding circumstances.
"[F]ighting words cannot be understood as a precise category of prescribable speech. `Fighting words' are not defined by particular lists of words that, when spoken, are unprotected by the First Amendment. The use of language, the nuances and subtleties of words, the context in which words are used to elicit compassion or to invoke retaliatory angry, are very complex and often inscrutable."
63 Fordham L.Rev. at 838. However, in light of the recent case law concerning words denoting racial hate, political slurs, and slurs regarding another's sexual orientation, such speech is not curtailed as to the ideas or concept that the words embody, but rather their use is curtailed under circumstances where retaliation is likely. It is the violence and threat to public safety and order that is *1216 sought to be avoided. Thus, in Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the United States Supreme Court remanded a case with orders to enter a judgment of acquittal where the petitioner, during a political debate, stated that if he were inducted into the army, the first man that he would want to shoot was Lyndon Baines Johnson, the then President of the United States. The petitioner was charged with threatening the President's life, in violation of a Federal statute criminalizing threats of violence directed against the President. The United States Supreme Court stated that this statute was constitutional on its face, because "[t]he Nation undoubtedly has a valid, if an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence.... Nevertheless, a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." Id. at 707, 89 S.Ct. at 1401.
"[T]hreats of violence as a class of speech receive no First Amendment protection because the threats create a fear of violence, disrupt society, and may erupt into the actual threatened act. The government could prohibit all violent threats based on these reasons, or it could criminalize only violent threats against the President of the United States, because the same factors fear, disruption, and actual violenceapply with special force to the president. The regulation of such threats, although limited only to ones against the President, is grounded in sufficiently neutral reasoning that constitutionally excludes the entire class of violent threats; therefore the discrimination poses no serious danger of viewpoint or idea discrimination."
Melody L. Hurdle, R.A.V. v. City of St. Paul; The Continuing Confusion of the Fighting Words Doctrine, 47 Vand.L.Rev. 1143, 1159-60 (May 1994). But see Federal Prosecution of Cross-Burners, 107 Harv.L.Rev. 1729, 1732 (May 1994) ("threats of violence, like fighting words, often contain a significant expressive component. Laws selectively proscribing threats implicate R.A.V.'s underlying concern with preventing censorship in the same way as do laws selectively proscribing fighting words.")
Thus, the "fighting words" analysis is applied to lewd, abusive, or obscene language that is likely to result in violence or public disorder. The offense of harassment in Alabama is defined in § 13A-11-8, Code of Alabama 1975, which is found in the chapter of the Code dealing with offenses against public order and safety. Verbal harassment, defined by § 13A-11-8(a)(1)(b) and the subject of this case, has been construed by Alabama case law to apply only to "fighting words." Verbal harassment is defined as follows:
"(a)(1) HarassmentA person commits the crime of harassment if, with intent to harass, annoy or alarm another person, he:
". . . .
"(b) Directs abusive or obscene language or makes an obscene gesture towards another person."
In B.E.S. v. State, 629 So.2d 761 (Ala. Cr.App.1993), the appellant was charged with harassment and adjudicated a delinquent for verbally harassing a female victim by telling her to "shut the F___ up and ... don't let the door hit [her] in the ass when [she left]." There was further testimony that the appellant and his brother attempted to intimidate the victim's husband by balling up their fists and striking their own hands when they saw the husband. Testimony also revealed that the appellant and his brother followed the victim's truck while the victim was attempting to leave with her two grandchildren in another automobile and "tailgated" the victim while shining a spotlight into her eyes. This court held that the evidence adduced did not support a charge of harassment, as the words did not constitute "fighting words"; however, the court noted that the evidence might have supported a charge of reckless endangerment under § 13A-6-24 or menacing under § 13A-6-23. This court, in B.E.S. v. State, supra at 763, noted:
"In order to bring § 13A-11-8(a)(1)(b) within the constitutionally permitted legislation, we have held that the words `abusive or obscene language' as used in this statute, are to be `interpreted narrowly to apply only to "fighting words."' Robinson *1217 v. State, 615 So.2d 112, 113 (Ala.Cr.App. 1982) (applying Swann v. City of Huntsville, 455 So.2d 944, 950 (Ala.Cr.App.1984), and Mosley v. City of Auburn, 428 So.2d 165, 166 (Ala.Cr.App.1982), superseded on other grounds, Mason v. City of Vestavia Hills, 518 So.2d 221 (Ala.Cr.App.1987), wherein this Court had previously interpreted in the same manner the same words contained in § 13A-11-7(a)(3), the disorderly statute[)]."
In determining that these words did not constitute "fighting words," this court held that the circumstances under which the words were uttered, "including the fact that the statements were made during a private quarrel in the residence occupied by both the speaker and the addressee," id. at 765, were important factors to be considered by the court. If these same comments had been made under a different set of circumstances, such as in a public forum, they may have been constituted "fighting words." Id., citing State v. James M., 111 N.M. 473, 806 P.2d 1063, 1066 (N.M.App.1990), cert. denied, 111 N.M. 529, 807 P.2d 227 (N.M.1991) (wherein the defendant's statements amounted to "fighting words" as he and another were arguing on a public sidewalk and four or five other people had gathered to watch.) Because of the requirement that verbal harassment to be actionable must constitute "fighting words" in the State of Alabama, a threat alone will not support a conviction of harassment. Cf. Shewmake v. City of Montgomery, 506 So.2d 383 (Ala.Cr.App.1987) (wherein the appellant was convicted of resisting arrest and physical harassment for refusing to cooperate with officers who were attempting to arrest him, slamming the door to the residence on one of the officer's legs, telling them to "watch out" because he had a gun, cursing them, threatening to kill them, and kicking them before being placed in the police car). Cf. T.W. v. State, 665 So.2d 987 (Ala.Cr.App.1995) (wherein the appellant was convicted of harassment because of an obscene gesture, i.e., grabbing his crotch and shaking it at members of the family whose daughter he was accused of raping.)
Harassment is actionable depends on its victim, e.g., policemen are held to a different standard when analyzing whether statements constitute "fighting words"[2]; moreover, presumably, statements made to classes of victims who may not be perceived as persons who would likely respond with physical retaliation, such as most females, children and the handicapped, may seem to require a higher level of "low speech" to constitute "fighting words." However, this possible discrimination as to victims is explainable in that the purpose of making these offenses actionable is to ensure public safety and public order. Therefore, in the present case, where the appellant threatened the victim after slowing down in his automobile and then immediately leaving the scene, there is no evidence that the statement constituted "fighting words" that would sustain a conviction for harassment.
While such conduct is reprehensible, at presently there is no offense that would properly encompass this activity. But see Ex parte James, 468 So.2d 889, 891 n. 3 (Ala.1984) (wherein an appellant was improperly convicted of robbery in that there was no proof of theft, but the element of threat was clearly established, causing the Alabama Supreme Court to note that the evidence may have supported a charge of menacing under § 13A-6-23, or harassment under § 13A-11-8). Blacks Law Dictionary (6th ed.1990) defines "menace" as "[t]o threaten; make threats. An unlawful threat of duress or injury to the person, property or character of another." However, in Alabama, menacing is defined by § 13A-6-23, Code of Alabama 1975, as follows:
"A person commits the crime of menacing if, by physical action, he intentionally places or attempts to place another person of imminent serious physical injury."
Thus, Alabama requires a physical action to complete the offense of menacing. The commentary to this section states that the typical offense of menacing occurs when the defendant, "intending to frighten another, points *1218 an unloaded gun at him, though not known by the victim to be so." Chapman v. State, 78 Ala. 463 (1885) (aiming an unloaded gun in a menacing manner so as to terrify victim not criminal assault; there must be a present intention, as well as a present ability); Johnson v. State, 651 So.2d 1085 (Ala.Cr.App. 1984) (wherein the appellant pointed a shotgun at the victim and stated, "I'll kill you"; following which the victim heard a shot fired over her head). Similarly, in Mosley v. City of Auburn, 428 So.2d 165 (Ala.Cr.App.1982), the appellant was charged with reckless endangerment and harassment, but ultimately was convicted of the lesser included offenses of menacing and disorderly conduct. In Mosley v. City of Auburn, evidence was presented that the appellant threatened to kill the prosecuting witness, pushed him, and slashed at him at least six times with a pocketknife.
It is clear that threats may be criminalized without violating the Constitution:
"The majority [in R.A.V. v. City of St. Paul], identified the rationale for proscribing threats as `protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur.' The majority, however, did not thoroughly analyze these factors. The majority is correct that fear for the President's life would create a substantial public disruption. The possibility that the threatened violence against the President will occur, however, is most likely very small. Because Presidents are generally deemed to be responsible for the country's policies, it would not be surprising if they received death threats over the course of their tenure in office. Due to lack of conviction and extraordinarily tight security, however, such threats are rarely acted upon. The low probability of the successful completion of the threatened action necessarily reduces the level of public fear of violence. Members of the general public are probably more afraid of threats of violence against themselves because of the high crime rates in our society."
Minnesota Burning: R.A.V. v. City of St. Paul and First Amendment Precedent, 21 Hastings Const. L.Q. at ___.
A number of states have enacted statutes prohibiting threats, and those statutes have withstood constitutional challenges. See e.g., Thomas v. Com., 574 S.W.2d 903 (Ky.App. 1978). In Thomas v. Com., the Court noted that it had an obligation to "narrow the application of the statute to serious threats intended to convey a real apprehension of imminent attack." Id. at 906.
"In drafting legislation penalizing threats, we would not wish to authorize grave sanctions against the kind of verbal threats which expresses transitory anger rather than settled purpose to carry out the threat or to terrorize the other person.... The constitutionality of statutes similar to [the Kentucky Terroristic Statute] has been attacked in a number of other jurisdictions. In all of these cases the statutes passed constitutional muster despite arguments identical to those made by appellant herein."
Id. at 907. See also Masson v. Slaton, 320 F.Supp. 669 (N.D.Ga.1970) (a Georgia terroristic threatening statute upheld against constitutional challenge despite allegation that it proscribed constitutionally protected conduct by making bare statements without an overt act or attempt to carry out the threat illegal). The Supreme Court of Maine, in State v. Lizotte, 256 A.2d 439 (Maine 1969), stated that "the word `threat' connotes `menace,' that `the circumstances under which the threat is uttered and the relations between the parties may be taken into consideration' and that `(t)he threat must also be such as would ordinarily create alarm.'" Id. at 439, quoting State v. Cashman, 217 A.2d 28, 29 (Maine 1966).
In Alabama, the only legal recourse that can be taken by a victim of threats is the seeking of a temporary restraining order or injunction. However, the possible ineffectiveness of these measures has been noted and bemoaned in the context of anti-stalking laws.
"The existence of stalkers has been widely known to experts of domestic violence, local police, prosecutors, and most *1219 notably, the victims. Prior to the creation of anti-stalking statutes, every state had criminal statutes prohibiting threatening or obscene telephone calls. However, these statutes, while helpful, only prohibited one tactic of harassment. Very few states prior to 1990, actually prohibited the following or threatening of another individual. Although a victim would complain of being followed, harassed and threatened, the stalker had not broken any law. Thus, police and prosecutors were unable to respond until the victim was actually harmed.
". . . .
"Prior to the enactment of anti-stalking laws, civil laws were traditionally used to provide victims of harassment with limited relief. The most common means of providing a stalking victim with immediate relief was the injunction. However, civil remedies have been of limited effectiveness due to the costs, the time necessary to obtain relief, and the sporadic enforcement of restraining orders."
James C. Wickens, Michigan's New Anti-Stalking Laws: Good Intentions Gone Awry, 1994 Det.C.L.Rev. 157, 159-60 (Spring 1994). See also Robert N. Miller, "Stalk Talk": A First Look at Anti-Stalking Legislation, 50 Wash. & Lee L.Rev. 1303, 1304 (Summer 1993) ("These stalking laws are part of an effort by legislators to counter the ineffectiveness of injunctions and restraining orders and prevent stalking and other domestic violence."). However, under current law in Alabama, a verbal threat alone, in circumstances that would not cause public disorder or unrest by being likely to start a fight, does not constitute an offense. Therefore, in the present case, the appellant's conviction for harassment was improper. The judgment of the trial court is reversed and a judgment rendered for the appellant.
REVERSED AND JUDGMENT RENDERED.
TAYLOR, P.J., and LONG, J., concur specially with opinions.
PATTERSON, J., concurs in result only without opinion.
COBB, J., dissents with opinion.
TAYLOR, Presiding Judge, concurring specially.
I do not believe that the law should be "genderized" as the dissent proposes in this case. Before the bar of justice, all people must be treated alike, whether they are black or white, male or female, regardless of their religious beliefs, or any other considerations. Concepts of equal protection of the laws absolutely require that laws must not be different as they are applied to men and women.
LONG, Judge, concurring specially.
Because of the way the harassment statute is written, I regretfully must agree with the majority's holding. However, I join Judge Cobb in encouraging our legislature to take steps to protect citizens who become the target of a credible threat of harm or death. I am not so concerned about the law's demand that people have thick skins in the face of insults or coarse language, and I believe that the threshold for what may be considered "fighting words" should be high. There is an obvious danger in criminalizing words that merely hurt the feelings of others or offend their sensibilities. Nonetheless, I am troubled that our laws will countenance an intentional threat that places another person in reasonable fear for his or her safety. It seems peculiar to me that while our anti-stalking law recognizes the real harm caused by a credible threat when made in conjunction with repeated following or harassing behavior, there is no law comprehending the harm caused by a credible face-to-face threat standing alone. See § 13A-6-90 et seq., Ala. Code 1975. Even more peculiar, under § 13A-11-8(b)(1), a communication by telephone or mail, made with the intent to alarm another person, is considered a criminal act. Thus, apparently it is illegal to threaten someone over the telephone, but perfectly legal to threaten to kill someone in person. This court, however, does not write the laws.
*1220 COBB, Judge, dissenting.
The majority reversed the appellant's conviction for harassment and rendered a judgment for the appellant, holding that his verbal threats to the prosecuting witness did not constitute "fighting words." I strongly disagree. Therefore, I must respectfully dissent.
In a recent decision of this court, T.W. v. State, 665 So.2d 987 (Ala.Cr.App.1995), we upheld a conviction of harassment citing Works v. State, 328 So.2d 624 (Ala.Civ.App. 1993), which stated that "[w]hat is a threat must be distinguished from what is constitutionally protected speech," quoting Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). "Whether the threat be against the life of a President, or to burn the house of an ordinary citizen, the protection of the First Amendment does not extend to such conduct." Works, supra.
In the instant case, a female social worker, while pumping gas into her vehicle, was threatened by a man she had investigated based on a child abuse complaint. The appellant drove through the gas station and told her, "I'm going to get you, little girl. You're as good as dead," and then drove away.
The majority concludes that no crime occurred because it believes that this overt and undisguised threat to kill the victim did not constitute "fighting words." I disagree.
The concept of "fighting words" has been introduced to restrict the litany of obscenities or other socially unacceptable modes of communication that serve as a factual basis for countless harassment charges. See. J. Nowak and R. Rotunda, Constitutional Law § 1637 (4th ed.1991) ["government regulation of speech" has been allowed when the purpose of the statute is to proscribe "`fighting words.'"] "[W]ords may or may not be `fighting words' depending upon the circumstances of their utterance." Lewis v. New Orleans, 415 U.S. 130, 135, 94 S.Ct. 970, 973, 39 L.Ed.2d 214 (1974) (Powell, J., concurring). B.E.S. v. State, 629 So.2d 761 (Ala.Cr. App.1993). In this case, the speech was not obscene, but threatening, alarming, abusive, and clearly designed to frighten the victim and to disturb her peace of mind and sense of well being. Rather than retaliating in a public place, the appellant made his plans of revenge known to the victim, who was simply performing her duties to protect children as a social worker for the Department of Human Resources.
To require, as the majority does, that the State prove, in a case where a female victim has been threatened, that the words spoken would incite her to fight or attack the harasser creates an unrealistic standard. Few women would ever testify that threats of violence motivated them to violent acts. If, however, the victim's husband, male friend, or male relative had been present, a fight might well have been the natural response of her male companion.
In its opinion, the majority relies upon B.E.S. v. State, 629 So.2d 761 (Ala.Cr.App. 1993), in which the conviction for harassment is overturned. This case is clearly distinguishable. First, the language, "shut the f___ up and ... don't let the door hit [you] in the ass" was not a threat to do bodily harm or to kill the victim. The court also took into consideration that the incident occurred "during a private quarrel in the residence occupied by the speaker and the addressee," id. at 765, unlike this case in which the threat to kill was in a public place.
The majority also fails to explain how a threat to kill is harassment when made to police officers who are attempting to execute a warrant, Shewmake v. City of Montgomery, 506 So.2d 383 (Ala.Cr.App.1987), but not to a social worker who is merely pumping gas.
The majority correctly concludes that threats may be criminalized. They incorrectly conclude that Alabama's present harassment statute does not encompass such threats unless they meet the "fighting words" threshold. It is my contention that this issue should be resolved by the Alabama Supreme Court. If, upon further review, the majority remains successful, then the question of affording our citizenry protection from substantial threats of violence should be addressed by the Alabama Legislature as has been done in other states. See, e.g., Thomas *1221 v. Commonwealth of Kentucky, 574 S.W.2d 903 (App.1978).
NOTES
[1] "The notion that words can constitute acts with legal consequences is as old as law itself and permeates most areas of modern law. For instances, a promise made orally may bind the promisor in contract. Under other circumstances, oral statements may constitute fraud. Similarly, a false or malicious statement about another person may result in a tort action for slander. In the criminal sphere, words between two or more persons about the planning of a criminal act may constitute conspiracy even if not criminal action follows. In a trial court, words may be verbal acts not subject to the hearsay rules. Thus, the classification of the harmful speech as a form of illegal conduct should be readily acceptable to the court."

The First Amendment Distinction Between Conduct and Content: A Conceptual Framework For Understanding Fighting Words Jurisprudence, supra, at 843-44.
[2] See Robinson v. State, 615 So.2d 112, 114 (Ala.Cr.App.1992); L.M.A.W. v. State, 611 So.2d 497, 497-98 (Ala.Cr.App.1992).