## WATTS *v.* UNITED STATES.

No. 1107, Misc.   Decided April 21, 1969.

*Joseph Forer* for petitioner.

*Solicitor General Griswold* for the United States.

*Ralph J. Temple, Melvin L. Wulf,* and *Lawrence Speiser* for the American Civil Liberties Union et al. as *amici curiae.*

PER CURIAM.

After a jury trial in the United States District Court for the District of Columbia, petitioner was convicted of violating a 1917 statute which prohibits any person from "knowingly and willfully . . . [making] any threat to take the life of or to inflict bodily harm upon the President of the United States . . . ." *   The incident

---

*18 U. S. C. § 871 (a) provides:

"Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office

which led to petitioner's arrest occurred on August 27, 1966, during a public rally on the Washington Monument grounds. The crowd present broke up into small discussion groups and petitioner joined a gathering scheduled to discuss police brutality. Most of those in the group were quite young, either in their teens or early twenties. Petitioner, who himself was 18 years old, entered into the discussion after one member of the group suggested that the young people present should get more education before expressing their views. According to an investigator for the Army Counter Intelligence Corps who was present, petitioner responded: "They always holler at us to get an education. And now I have already received my draft classification as 1–A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L. B. J." "They are not going to make me kill my black brothers." On the basis of this statement, the jury found that petitioner had committed a felony by knowingly and willfully threatening the President. The United States Court of Appeals for the District of Columbia Circuit affirmed by a two-to-one vote. 131 U. S. App. D. C. 125, 402 F. 2d 676 (1968). We reverse.

At the close of the Government's case, petitioner's trial counsel moved for a judgment of acquittal. He contended that there was "absolutely no evidence on the basis of which the jury would be entitled to find that [petitioner] made a threat against the life of the Presi-

---

of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

dent." He stressed the fact that petitioner's statement was made during a political debate, that it was expressly made conditional upon an event—induction into the Armed Forces—which petitioner vowed would never occur, and that both petitioner and the crowd laughed after the statement was made. He concluded, "Now actually what happened here in all this was a kind of very crude offensive method of stating a political opposition to the President. What he was saying, he says, I don't want to shoot black people because I don't consider them my enemy, and if they put a rifle in my hand it is the people that put the rifle in my hand, as symbolized by the President, who are my real enemy." We hold that the trial judge erred in denying this motion.

Certainly the statute under which petitioner was convicted is constitutional on its face. The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence. See H. R. Rep. No. 652, 64th Cong., 1st Sess. (1916). Nevertheless, a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech.

The judges in the Court of Appeals differed over whether or not the "willfullness" requirement of the statute implied that a defendant must have intended to carry out his "threat." Some early cases found the willfullness requirement met if the speaker voluntarily uttered the charged words with "an *apparent* determination to carry them into execution." *Ragansky* v. *United States,* 253 F. 643, 645 (C. A. 7th Cir. 1918) (emphasis supplied); cf. *Pierce* v. *United States,* 365 F. 2d 292 (C. A.

708

10th Cir. 1966). The majority below seemed to agree. Perhaps this interpretation is correct, although we have grave doubts about it. See the dissenting opinion below, 131 U. S. App. D. C., at 135–142, 402 F. 2d, at 686–693 (Wright, J.). But whatever the "willfullness" requirement implies, the statute initially requires the Government to prove a true "threat." We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term. For we must interpret the language Congress chose "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964). The language of the political arena, like the language used in labor disputes, see *Linn* v. *United Plant Guard Workers of America,* 383 U. S. 53, 58 (1966), is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was "a kind of very crude offensive method of stating a political opposition to the President." Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise.

The motion for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted and the judgment of the Court of Appeals is reversed. The case is remanded with instructions that it be returned to the District Court for entry of a judgment of acquittal.

*It is so ordered.*

MR. JUSTICE STEWART would deny the petition for certiorari.

MR. JUSTICE WHITE dissents.

MR. JUSTICE DOUGLAS, concurring.

The charge in this case is of an ancient vintage.

The federal statute under which petitioner was convicted traces its ancestry to the Statute of Treasons (25 Edw. 3) which made it a crime to "compass or imagine the Death of . . . the King." Note, Threats to Take the Life of the President, 32 Harv. L. Rev. 724, 725 (1919). It is said that one Walter Walker, a 15th century keeper of an inn known as the "Crown," was convicted under the Statute of Treasons for telling his son: "Tom, if thou behavest thyself well, I will make thee heir to the CROWN." He was found guilty of compassing and imagining the death of the King, hanged, drawn, and quartered. 1 J. Campbell, Lives of the Chief Justices of England 151 (1873).

In the time of Edward IV, one Thomas Burdet who predicted that the king would "soon die, with a view to alienate the affections" of the people was indicted for "compassing and imagining of the death of the King," 79 Eng. Rep. 706 (1477)—the crime of constructive treason [1] with which the old reports are filled.

[1] The prosecution in those cases laid bare to the juries that the treasonous thoughts were the heart of the matter; "the original of his Treasons proceeded from the imagination of his heart; which imagination was in itself High-Treason, albeit the same proceeded not to any overt fact: and the heart being possessed with the abundance of his traitorous imagination, and not being able so to contain itself, burst forth in vile and traitorous Speeches, and from thence to horrible and heinous actions." *Trial of Sir John Perrot,* 1 How. St. Tr. 1315, 1318 (1592). "[T]he high treason charged, is the compassing or imagining (in other words, the intending or designing) the death of the king; I mean his NATURAL DEATH; which being a hidden operation of the mind, an overt act is any thing which legally proves the existence of such traitorous design and intention—I say that the design against the king's natural life, is the high treason under the first branch of the statute; and whatever is evidence, which may be legally laid before a jury to judge of the traitorous intention, is a legal overt act; because an overt act is

In the time of Charles II, one Edward Brownlow was indicted "for speaking these words, that he wished all the gentry in the land would kill one another, so that the comminalty might live the better." 3 Middlesex County Rec. 326 (1888). In the same year (1662) one Robert Thornell was indicted for saying "that if the Kinge did side with the Bishops, the divell take Kinge and the Bishops too." *Id.,* at 327.

While our Alien and Sedition Laws were in force, John Adams, President of the United States, en route from Philadelphia, Pennsylvania, to Quincy, Massachusetts, stopped in Newark, New Jersey, where he was greeted by a crowd and by a committee that saluted him by firing a cannon.

A bystander said, "There goes the President and they are firing at his ass." Luther Baldwin was indicted for replying that he did not care "if they fired through his ass." He was convicted in the federal court for speaking "sedicious words tending to defame the President and Government of the United States" and fined, assessed court costs and expenses, and committed to jail until the fine and fees were paid. See J. Smith, Freedom's Fetters 270–274 (1956).

The Alien and Sedition Laws constituted one of our sorriest chapters; and I had thought we had done with them forever.[2]

---

nothing but legal evidence embodied upon the record." *Trial of Thomas Hardy,* 24 How. St. Tr. 199, 894 (1794). And see 84 Eng. Rep. 1057 (1708).

For a discussion of the adequacy of mere words as overt acts see 3 W. Holdsworth, History of English Law 293 (1927).

[2] "In the Sedition Act cases, the tendency of words to produce acts against the peace and security of the community was stretched to its utmost latitude. Likewise, judges and juries, in their willingness to presume evil intent on the part of Republican writers, largely nullified the safeguards erected by the Sedition Act itself. Criticism of the President and Congress—in which every American indulges as his birthright—was severely punished; yet this practice

Yet the present statute has hardly fared better. "Like the Statute of Treasons, section 871 was passed in a 'relatively calm peacetime spring,' but has been construed under circumstances when intolerance for free speech was much greater than it normally might be." Note, Threatening the President: Protected Dissenter or Political Assassin, 57 Geo. L. J. 553, 570 (1969). Convictions under 18 U. S. C. § 871 have been sustained for displaying posters urging passersby to "hang [President] Roosevelt." *United States* v. *Apel,* 44 F. Supp. 592, 593 (D. C. N. D. Ill. 1942); for declaring that "President Wilson ought to be killed. It is a wonder some one has not done it already. If I had an opportunity, I would do it myself." *United States* v. *Stickrath,* 242 F. 151, 152 (D. C. S. D. Ohio 1917); for declaring that "Wilson is a wooden-headed son of a bitch. I wish Wilson was in hell, and if I had the power I would put him there," *Clark* v. *United States,* 250 F. 449 (C. A. 5th Cir. 1918). In sustaining an indictment under the statute against a man who indicated that he would enjoy shooting President Wilson if he had the chance, the trial court explained the thrust of § 871:

"The purpose of the statute was undoubtedly, not only the protection of the President, but also the prohibition of just such statements as those alleged in this indictment. The expression of such direful intentions and desires, not only indicates a spirit of disloyalty to the nation bordering upon treason, but is, in a very real sense, a menace to the peace and safety of the country. . . . It arouses resentment

manifestly has only a remote tendency to injure and bring into contempt the government of the United States. In short, much that has become commonplace in American political life was put under the ban by the Federalist lawmakers and judges of 1798." J. Miller, Crisis in Freedom 233 (1951).

and concern on the part of patriotic citizens." *United States* v. *Jasick*, 252 F. 931, 933 (D. C. E. D. Mich. 1918).

Suppression of speech as an effective police measure is an old, old device, outlawed by our Constitution.

MR. JUSTICE FORTAS, with whom MR. JUSTICE HARLAN joins, dissenting.

The Court holds, without hearing, that this statute is constitutional and that it is here wrongly applied. Neither of these rulings should be made without hearing, even if we assume that they are correct.

Perhaps this is a trivial case because of its peculiar facts and because the petitioner was merely given a suspended sentence. That does not justify the Court's action. It should induce us to deny certiorari, not to decide the case on its merits and to adjudicate the difficult questions that it presents.