**George F. METZ, Petitioner,**

v.

**DEPARTMENT OF the TREASURY, Federal Law Enforcement Training Center, Respondent.**

**Appeal No. 85–922.**

United States Court of Appeals, Federal Circuit.

Jan. 2, 1986.

George M. Rountree, Brunswick, Ga., argued, for petitioner. With him on brief was Terry K. Floyd.

William J. Snider, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for respondent. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and M. Susan Burnett, Asst. Director. Barbara S. Fredericks, Asst. General Counsel and Florence N. Bridges, Dept. of the Treasury, Washington, D.C., of counsel.

Before KASHIWA, Circuit Judge, NICHOLS, Senior Circuit Judge, and SMITH, Circuit Judge.

EDWARD S. SMITH, Circuit Judge.

In this Government employee case, the Merit Systems Protection Board (board) sustained the Department of the Treasury's (agency) decision to remove George F. Metz (Metz) from his position as an instructor at the Federal Law Enforcement Training Center (FLETC). In sustaining

Metz' removal for threatening to kill his superiors, the board reversed the initial decision of its presiding official, which decision substituted a suspension for the agency's removal. We reverse.

## Issues

We address two issues on appeal. First, we decide if the board used the correct legal standard to decide whether Metz' statements were threats. Second, we determine whether the board had substantial evidence to find that Metz threatened his supervisors, given the applicable legal standard.

## Background [1]

James Lanier (Lanier) supervised Metz in the driver specialties branch of FLETC. On July 7, 1982, Lanier gave Metz an annual performance rating of "excellent." Metz became upset because he believed he deserved an "outstanding" rating and stated that he would harm himself and others. On July 12, Metz met with Lanier and confirmed his earlier statement. Lanier directed his supervisor's attention to the statements. Lanier's superiors decided to meet with Metz in order to alleviate Metz' frustrations. David Epstein (Epstein) scheduled a meeting with Robert McKann (McKann), Lanier, and Metz. Epstein asked Metz to affirm the earlier statements and Metz did so, but the question and the answer were both quite vague. Additionally, two of Metz' co-workers reported conversations with Metz in which Metz had stated threats to kill his superiors.

The agency subsequently removed Metz for threatening his superiors and for disruptive behavior. The presiding official found Metz innocent of making threatening statements and reversed the removal. The presiding official, however, found that Metz made inappropriate remarks that caused minor disruption and imposed a suspension. The full board reversed the pre-

siding official's initial decision and sustained the removal.

## Opinion

### A. Legal Standards

This court reviews board decisions for errors of law. In this case, we decide whether the board applied the proper legal test to determine if Metz actually threatened his superiors. We outline a method to analyze the evidence in order to effect the legal standard given by our cases. Although the board recited the proper legal standard, its analysis of the evidence was insufficient. We conclude that clear guidelines for analyzing evidence in this type of case will assist the board in reaching legally correct results.

Any threat made to a Government supervisor is a serious matter that clearly impairs the efficiency of the service. In some cases, however, it is difficult for the agency to determine if a threat has been made. This court has held that the board must use "the connotation which a reasonable person would give to the words" [2] in order to determine if the words constituted a threat.

■ In order to apply the reasonable person standard, however, the board must weigh the evidence. We direct the board to consider the following evidentiary factors in deciding whether an employee threatened his supervisors or co-workers:

(1) The listener's reactions;

(2) The listener's apprehension of harm;

(3) The speaker's intent;

(4) Any conditional nature of the statements; and

(5) The attendant circumstances.

■ The United States Supreme Court provided the basis for these standards by writing "the statute initially requires the Government to prove a true 'threat.'" [3] This standard applies to Government agency regulations as well as the statute con-

**1.** The board's final decision is reported in *Metz v. Department of the Treasury, Fed. Law Enforcement Training Center,* 23 M.S.P.R. 576 (1984).

**2.** *Meehan v. United States Postal Serv.,* 718 F.2d 1069, 1075 (Fed.Cir.1983).

**3.** *Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969).

strued in *Watts.* Our guidelines effect the appropriate standard by directing the board to give objective evidence heavy weight. The standards direct the board to apply the reasonable person criterion by considering what reasonable persons who heard the statements actually did. For instance, a listener who reacted by calling police after hearing a statement is more likely to have heard a threat than a listener who did nothing. Likewise, an employee who made a generalized conditional statement is less likely to have intended to threaten a co-worker than an employee who stated a simple threat.[4] We do not instruct the board to rely on objective evidence alone. A credible supervisor might testify that he feared harm; such testimony tends to show that an employee made a threat. Evidence of an employee's intent in making a statement can show that the statement was a threat. Rumors, however, or fear based on rumors, cannot suffice to prove that an employee threatened anyone. While we do not instruct the board to disregard subjective evidence of fear or intent, we do direct the board to give objective evidence heavy weight.[5]

## B. *Substantial Evidence*

We now decide whether the board's decision was supported by substantial evidence. The board's decision states, "the employees who heard the statements were concerned and reported the statements to the agency."[6] We examine this evidence in detail.

Two employees, Olsen and Barton, allegedly heard Metz make remarks that threatened his superiors. How did Olsen and Barton react to these "threats"? Olsen went camping in North Carolina for a week and Barton went to work. It is literally true that Olsen and Barton were "concerned"; both Olsen and Barton stated concern in their testimony before the presiding

official. However, both Olsen and Barton also testified that they did not expect Metz to carry out the "threats." How did the agency find out about the conversations between Metz and Olsen and Barton? Barton happened to mention his talk with Metz in a casual conversation to a friend who was a supervisor. Later in the day, an agency official asked Barton to make a statement. Barton did find Metz' remarks interesting enough to mention them in casual conversation, but Barton did nothing more. Olsen volunteered his conversation with Metz only after he returned from his vacation and learned that the agency intended to discipline Metz. The record does not provide a shred of evidence showing that Barton or Olsen reacted to Metz' statements as if they were threats.

Now we consider the supervisors' testimony. Lanier testified before the presiding official that he never feared personal harm from Metz, nor did he fear that Metz would attack any other FLETC official. Epstein testified that Metz tacitly admitted making threats, but Epstein also stated that he never heard Metz make a threat. Both of these gentlemen testified that their primary concern was to relieve Metz' frustration. Only McKann testified that Metz threatened Epstein and McKann in their meeting with Lanier and Metz. The presiding official found specifically that McKann inferred a threat from actions by Metz that did not occur. The presiding official exercises wide discretion when making findings on credibility. The board may not overturn the presiding official's credibility determinations without articulating a sound reason, based on the record.[7] Therefore, the board could not properly credit McKann's testimony in finding that Metz threatened FLETC officials.

**4.** *See Broadnax v. United States Postal Serv.,* 9 M.S.P.B. 404, 412–13, 10 M.S.P.R. 142, 153–55 (1982).

**5.** *See Williams v. Veterans Admin.,* 701 F.2d 764, 765–66 (8th Cir.1983); *Meehan,* 718 F.2d 1069; *Broadnax,* 9 M.S.P.B. 404, 10 M.S.P.R. 142; *Sierra v. Department of the Army,* 5 M.S.P.B. 514, 5

M.S.P.R. 523 (1981) (these cases illustrate how the evidence should be considered).

**6.** *Metz,* 23 M.S.P.R. at 578.

**7.** *Jackson v. Veterans Admin.,* 768 F.2d 1325, 1331 (Fed.Cir.1985).

■ After reviewing the evidence, we observe that the board sustained Metz' removal based on the testimony of five men. Lanier and Epstein testified they did not perceive Metz' statements as threats; Olsen and Barton testified that they had no expectation that Metz would harm his superiors, nor did they consider his statements serious enough to warrant reporting; and McKann's testimony was discredited by the presiding official. We conclude that the board's decision sustaining Metz' removal is not supported by substantial evidence and must be reversed.

### Conclusion

In its decision sustaining Metz' removal, the board decided that a reasonable person hearing Metz' statements would think those statements were threats. While this is the correct legal standard, the board erred because it did not consider the objective evidence in the record. When the board must decide whether statements are threats, we instruct it to consider the reactions and apprehensions of listeners, the wording of the statements, the speaker's intent, and the attendant circumstances. The board apparently did not do so in this case. Because no substantial evidence supports the board's finding that Metz threatened his superiors, the charges that Metz threatened to kill his supervisors and behaved disruptively by threatening to kill his supervisors were not proved. We reverse the board's decision sustaining Metz' removal.

REVERSED.

NICHOLS, Senior Circuit Judge, concurring in the result.

I concur in the reversal but, respectfully, am unable to join in much that is said in this opinion.

Its most basic flaw is that it tells the board what to do in future cases: "[w]e direct the board to consider the following evidentiary factors * * *," and, presumably, no others. It is an exercise in rule making. Now the court always should state the rule of law on which it relies, and

this rule may and often will apply to cases other than the one before the court. Here, however, of five "evidentiary factors," the board is ordered to consider in future cases, the fourth and fifth do not seem even to relate to any issue the opinion deals with, though they may have been suggested by other writings in this case, and by the Supreme Court authority cited, *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). We are in the midst of a national controversy about the "activist judge" and the need to return to basic principles distinguishing the legislative and the judicial functions.

No two cases are the same, and no case not yet before the court is foreseeable in all its aspects. The wise judge retains his freedom to deal with the unexpected by avoiding commitments how he will decide cases whose ramifications he cannot foresee. A senior member of this court, Judge Laramore, when active, used to say it is the unnecessary discourse that comes back to haunt one. Surely this simple case can be decided simply, on its facts.

If we are to prescribe rules, surely factor two should be not the listener's "apprehension of harm" alone, but also that of the person allegedly threatened, if he becomes aware of the alleged threat by its being repeated to him.

Mr. Metz's part of the school's curriculum was the course in how to drive a car having an endangered official passenger, so as to elude assassins. The pupils had to demonstrate their mastery of the necessary skills one by one, driving a car with the instructor, Mr. Metz, posing as the passenger. His was a unique and stressful occupation, as others realized as much as he did himself. Believing he was not getting the recognition he should, he indulged in overwrought hyperbole. It reached the ears of his supervisors who gave him a chance to explain and retract, which he did not take, not recognizing the danger to his job and career. Basically the problem arises from the fact that an enforcement agent (and especially an instructor of such agents, who must be a role model), is supposed to

be always cool and unflappable, to which ideal Metz had failed to conform. On the other hand, their supervisors are not supposed to be easily frightened. What Metz most needed was a three-week paid vacation on some tropic and eventless isle, but this is the last thing our benevolent government is likely to offer its overwrought employees.

In ordinary speech, nothing is more common than language importing mayhem or murder. Examples are: "When word of this blunder gets out, heads will roll!" "I cut him off at the knees!" "I am tired of repeating this argument and having my head bloodied!" "When you hear this, it will kill you!" "All he wants is an arm and a leg" (of one driving a hard bargain).

Metz's supervisors at first supposed his overwrought language denoted a mental affliction, but attempts to deal with it along that line collapsed when psychiatrists ruled that he was not dangerous to himself or others. An arrest warrant apparently was never executed. The "adverse action" now before us followed.

In fairness to the agency, it has to be admitted that even as "reformed" in 1978, the Civil Service laws are still not flexible in the means they afford supervisors to deal with somewhat bizarre personnel problems, not falling into the well-worn slots of mental disability, inadequate performance, or willful misconduct. And, in our far-flung civil service, even the bizarre is the ordinary somewhere. This, of course, does not mean that out of sympathy for executive problems we must condone application of the stigma of misconduct to a deserving employee when the record fails to show misconduct has occurred.

The *Watts* case teaches caution in interpreting alleged "threats" too literally. But that was a criminal case and, moreover, one with first amendment implications. It could well be that a "threat" must be more seriously intended in a criminal case and in an environment of protected political speech. I think we are more on our own here than our opinion recognizes. So all the more we need more cases before declaring rules.

To me it suffices that, excluding evidence disbelieved by the trier of fact, there is no evidence that Metz intended to state that he really would kill or commit serious bodily harm against himself or anyone else, no evidence that his listeners so understood him, or that the supervisors, when they heard about it, believed that they were threatened. So our panel unanimously holds. His choice of language was that normal to overwrought persons and no doubt upsetting, but a misconduct termination is for life. Since it is the function of judges to interpret the meaning of words, in course of assigning legal consequences to them, their interpretation must be controlling here.

The opinion does not state whether the panel reinstates the suspension of 30 days ordered by the presiding official, or directs a holding completely exonerating petitioner. I favor the latter, for the reason that "inappropriate remarks," the offense imputed by the presiding official, was not charged and is not, I think, a "lesser included offense," as that term is normally understood.