Dianne KAMPINEN, Plaintiff–
Appellant,

v.

Jude MARTINEZ, et al., Defendants–
Appellees.

No. 03–3221.

United States Court of Appeals,
Seventh Circuit.

Submitted June 17, 2004.[*]

Decided June 18, 2004.

Rehearing and Rehearing En Banc
Denied Aug. 3, 2004.

Dianne Kampinen, Chicago, IL, pro se.

Mara S. Georges, Office of the Corporation Counsel, Thomas P. Walsh, Office of the United States Attorney, Chicago, IL, for Defendants–Appellees.

---

[*] After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Before Hon. DIANE P. WOOD, Hon. TERENCE T. EVANS, and Hon. ANN CLAIRE WILLIAMS, Circuit Judges.

## ORDER

Dianne Kampinen found her way into a restricted area where then-President Clinton was speaking at a private luncheon, and ultimately she was arrested and committed briefly to a Chicago hospital for a psychiatric evaluation. She later brought this action under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging that several Chicago police officers and special agents of the United States Secret Service repeatedly violated her Fourth Amendment rights during the encounter. After dismissing several defendants as parties, the district court granted summary judgment for those remaining, Chicago officer Love and Secret Service agents Cho, Tilton, and Ardnt, We affirm.

The following facts are undisputed. On the morning of September 25, 1998, Kampinen heard on the radio that President Clinton would address a private, lunchtime fundraiser at the Merc Club located in the Mercantile Exchange building. Leaving the downtown office building where she worked as a private security guard, Kampinen walked to the Mercantile Exchange on her lunch break still wearing her security uniform and reached a security checkpoint set up outside the Merc Club for the President's visit. Kampinen told a security guard and then a Secret Service agent that she worked at another building and was on her lunch break. The agent screened Kampinen with a hand-held metal detector and allowed her through. Kampinen proceeded to the receptionist desk just outside the club, where President Clinton already was. Kampinen was met at the desk by a Mercantile Exchange employee who told her she was not allowed in the area. Kampinen returned to the checkpoint, and there an unidentified woman asked whether she would answer some questions. Kampinen agreed, and Secret Service agents led her to a small security room, where she met Officer Love and Special Agent Cho.

Kampinen supplied her name and birth date, but she carried no form of identification to corroborate either. The agents verified her identity after several telephone calls but in the process discovered that Kampinen had previously been arrested in 1988 for criminal trespass at the Ritz Carlton Hotel. Kampinen stated that the charge had been dismissed, explaining the details leading up to the arrest. By now about twenty minutes had passed, and Kampinen noticed the time and said she had to return to work. When she was then told that her boss already had been called and knew she would be late, Kampinen replied that if it is "Secret Service who called my boss, then it's probably okay if I will be late."

During this time Kampinen did not ask to leave or otherwise inquire about her status, but as the encounter continued she was told that she was being detained because she had been in a restricted area. As the agents continued to question Kampinen sporadically about "personal" matters and her "residency," they made several more telephone calls to further check her background. From these calls the agents learned that, in addition to a second arrest for trespass in 1996, Kampinen had been charged with resisting arrest in connection with the 1988 trespass charge, and that several months earlier the FBI had investigated several harassing telephone calls she made to members of Donald Trump's "organization." Acknowledging the agents' concern that anyone could be wearing a security guard's uniform with

494

her nametag, Kampinen at some point volunteered to accompany the agents to her workplace to retrieve her identification. Approximately seventy minutes past the end of her lunch break, the agents announced that they would go with Kampinen to her workplace for that purpose.

Once there Kampinen allowed Special Agent Cho to search her satchel for identification. Inside were several newspaper clippings about President Clinton and an article discussing a new method the Secret Service was employing to assess presidential-assassination threats and a guide on assassin profiles that individuals could order. While Cho sifted through these articles, Officer Love spotted a diary on a nearby shelf and asked to look at it. Kampinen at first agreed but then told him the volume was private because, in her words, she saw him "intently" reading the entries. Love closed the diary. By then he had read several passages expressing disdain for Democrats, as well as the final entry commenting on the presidential visit and noting, as he interpreted the entry, that President Clinton would be entering and leaving the Mercantile Exchange through the loading dock, which Love knew to be nonpublic information. Cho then asked Kampinen if they could search her apartment. She refused.

Approximately forty-five minutes after Kampinen refused to give consent to search her apartment, Special Agent Tilton arrived and told Kampinen that a complaint for criminal trespass had been filed against her at the behest of management at the Mercantile Exchange. Tilton discussed the possibility that Kampinen could be hospitalized, presumably for a psychiatric evaluation, and also explained that the Secret Service would seek a warrant to search her apartment if she did not consent. Officer Love and another officer eventually took Kampinen to a police station where she was processed on the criminal trespass charge and released. Two Secret Service agents, along with Love and another Chicago officer, then drove her to Northwestern Hospital. After the agents and police officers left the hospital, Kampinen signed a voluntary admittance form.

Kampinen stayed at Northwestern Hospital for seventy-two hours. On the second day a psychiatrist told her that she would be released the next day and that the Secret Service agents wanted to meet with her that afternoon. At the meeting Special Agents Tilton and Arndt again asked Kampinen to let them search her apartment. Kampinen agreed on the condition that counsel could be present during the search, and executed a consent form. Kampinen never hired a lawyer, despite calling several that night, but still she accompanied Special Agents Arndt and Breuker to her apartment after her release, unlocked the door for them, and allowed them to search her apartment without objection. They found nothing and left. Eventually, a state judge dismissed the trespass charge and no other charges were brought against Kampinen.

These events underlie Kampinen's claims that the defendants violated the Fourth Amendment by: (1) detaining her at the Mercantile Exchange; (2) searching her satchel and diary; (3) arresting her for criminal trespass; (4) causing her commitment to Northwestern Hospital; and (5) searching her apartment. The district court enlisted successive attorneys to represent her, but both withdrew with the first one citing irreconcilable differences and the second at Kampinen's behest. In granting summary judgment for the defendants, the district court concluded that the undisputed evidence established that the defendants had reasonable suspicion to detain Kampinen, which ripened into probable cause authorizing her arrest. As to

the searches, the district court reasoned that here again it was undisputed that the defendants searched Kampinen's satchel, read the incriminating diary entries, and searched her apartment all with Kampinen's consent. Finally, the district court held that Kampinen lacked evidence that her decision to admit herself to Northwestern was anything but voluntary.

As we interpret her brief on appeal, Kampinen challenges only the district court's conclusions regarding the reasonableness of her detention at the Mercantile Exchange, the search of her diary, and the legality of her arrest, in addition to raising a procedural argument. She does not contest the district court's resolution of her other claims, reciting her version of the events but making no legal argument.

█ Kampinen first argues that the defendants already had detained her beyond a reasonable length of time at the Mercantile Exchange, and so the district court erred in concluding that the defendants did not violate her Fourth Amendment right to be free from unreasonable seizure. Conceding that the defendants' initial questioning of her was consensual and required no level of suspicion, *see United States v. Scheets,* 188 F.3d 829, 836 (7th Cir.1999), Kampinen suggests that the encounter ripened into a de facto arrest after she had been with the agents for more than an hour past the end of her lunch break. Kampinen adds that her detention was unreasonable because her willing responses should have dispelled all suspicion.

Officers may briefly detain an individual based on reasonable suspicion of criminal involvement, so long as the length and scope of the detention are tailored to the stop's underlying justification. *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Scheets,* 188 F.3d at 838. There is no bright-line rule with regard to the permissible duration of a

*Terry* stop, and instead courts must assess whether law enforcement officers diligently pursued their investigation, as well as the amount of time reasonably required to confirm or dispel their suspicions. *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Detentions beyond an hour may well "approach the outer boundaries of permissible *Terry* stops," *United States v. Vega,* 72 F.3d 507, 515 (7th Cir.1995) (sixty-two minutes reasonable), but are not per se unreasonable, *see Gallegos v. City of Los Angeles,* 308 F.3d 987, 992 (9th Cir.2002) (forty-five to sixty minutes reasonable); *United States v. Gil,* 204 F.3d 1347, 1350 (11th Cir.2000) (seventy-five minutes reasonable); *Houston v. Clark County Sheriff Deputy John Does 1–5,* 174 F.3d 809, 815 (6th Cir.1999) (one hour reasonable); *United States v. McCarthy,* 77 F.3d 522, 531 (1st Cir.1996) (seventy-five minutes reasonable); *United States v. Bloomfield,* 40 F.3d 910, 917 (8th Cir.1994) (one hour reasonable). But length alone does not decide the issue, *see United States v. Owens,* 167 F.3d 739, 749 (1st Cir.1999); rather, we look to the totality of the circumstances to determine whether the stop was reasonable, *United States. v. Wimbush,* 337 F.3d 947, 950 (7th Cir.2003); *McCarthy,* 77 F.3d at 530–31.

Kampinen's summary judgment evidence leaves much to guesswork about the point where her encounter with the defendants became compulsory rather than consensual. By her own account she was a willing participant at least until the end of her lunch break, and even after that she exhibited no desire to leave once she learned that her absence had been cleared with her boss. On the other hand, at some point in the seventy minutes between the end of her lunch break and her return to her workplace with the defendants, Kampinen was told that she was being detained because she had entered a restricted area,

and obviously at that point she was no longer free to leave. *See United States v. Robinson,* 30 F.3d 774, 782 (7th Cir.1994). But isolating that point is impossible on this record. Still, even if Kampinen was detained soon after the end of her lunch break, we agree with the district court that the evidence points only to the conclusion that Kampinen's continued detention after that point was reasonable.

Kampinen's continuing detention was reasonable because the purpose of the stop—protecting the President from any potential threat—justifies greater intrusion into an individual's Fourth Amendment rights than would other circumstances. *See Stigile v. Clinton,* 110 F.3d 801, 803–04 (D.C.Cir.1997) (rejecting Fourth Amendment challenge to random drug testing of employees with access to President based on overwhelming interest in protecting President and Vice President); *see also Saucier v. Katz,* 533 U.S. 194, 208–09, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (recognizing special urgency of protecting Vice President); *Hunter v. Bryant,* 502 U.S. 224, 228–29, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (qualified immunity standard's allowance for reasonable error "is nowhere more important than when the specter of Presidential assassination is raised"); *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) ("The Nation undoubtedly has a valid, even overwhelming interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence."). Throughout the detention Kampinen was not handcuffed or restrained. *See Gallegos,* 308 F.3d at 992. And the agents diligently investigated her background. But rather than dispel their suspicions, the information the agents gathered only fueled them. When the agents first began questioning her, they already knew that Kampinen had

somehow managed to enter a restricted area only a few feet from the room where President Clinton was speaking, but was carrying no form of identification even though she was wearing a security uniform similar to those worn by Mercantile Exchange security guards. The agents then learned from Kampinen that she had not accidentally wandered into the area, but instead knew that the President would be present. Adding to their suspicion that Kampinen might present a threat to the President was Kampinen's previous history of arrests and, in particular, an FBI investigation earlier that year into her harassment of persons associated with Trump, whom Kampinen did not appear to know personally. Given the totality of these circumstances, particularly the potential harm of releasing Kampinen before confirming that she was not a threat to the President, we cannot say that the length of Kampinen's detention exceeded a permissible *Terry* stop.

■ We turn next to Kampinen's argument concerning the search of her diary. Kampinen argued before the district court that she retracted her consent for Officer Love to examine her diary before he could have determined that the passages were incriminating, but now she suggests that Love must have arrived at her workplace while she was still at the Mercantile Exchange and read her diary without consent. This contention was not presented to the district court and is waived. *See Belom v. Nat'l Futures Assoc.,* 284 F.3d 795, 799 (7th Cir.2002). And in any event, there is nothing but Kampinen's own speculation in her brief to support the contention that Love went to her workplace ahead of time. *See Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir.1999).

■ With regard to the legality of her arrest for criminal trespass, Kampinen

seems to disagree that the undisputed evidence established probable cause. Probable cause exists where an officer could reasonably believe, given his knowledge of the facts and circumstances at the time, that the defendant committed or was committing trespass. *United States v. Kincaid,* 212 F.3d 1025, 1028 (7th Cir.2000). A report by a single, credible witness will suffice as a basis for this knowledge even if the officer did not witness the encounter first-hand. *Woods v. City of Chicago,* 234 F.3d 979, 996 (7th Cir.2000). Here, Officer Love and Special Agent Tilton possessed probable cause given the criminal complaint initiated by a Mercantile Exchange employee who reported that Kampinen was found in a restricted area and had refused to leave when asked. *See* 720 Ill. Comp. Stat. 5/21–3(a)(3).

Finally, Kampinen sporadically asserts in her brief without elaboration that she did not have sufficient time to conduct discovery, but she identifies no specific ruling by the district court for us to review. *See Hojnacki v. Klein–Acosta,* 285 F.3d 544, 549 (7th Cir.2002). In any event, Kampinen had counsel who conducted rigorous discovery, and she would have been represented until the end had she not fired her second appointed attorney because his office was inconveniently located and he did not specialize in civil rights law. And to the extent Kampinen attempts to raise on appeal other claims not presented to the district court, those arguments are waived. *See Belom,* 284 F.3d at 799.

AFFIRMED.