In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2525

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KYLE MILBOURN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:07-cr-00159-JDT-KPF—**John Daniel Tinder,** *Judge.*

ARGUED DECEMBER 7, 2009—DECIDED APRIL 7, 2010

Before CUDAHY, WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Of all the things to burn in some-one's yard, Kyle Shroyer and Kyle Milbourn chose a cross. Of all the places to burn that cross, they chose the front yard of a rented house that served as the home for three biracial children. Eventually, Milbourn was charged with four counts: conspiracy to intimidate and interfere, because of the race of the occupants, with their right to occupy their home; a substantive charge of in-

timidation; using fire to commit a felony; and witness tampering. He was convicted after a jury trial on all four counts and sentenced to serve a term of 121 months. Today we resolve his appeal.

The rented house where the cross was burned was in a predominantly white neighborhood just off a main road in Muncie, Indiana. Paula Tracy and her boyfriend (Phillip Thrash), who are white, lived in the house with her three biracial children from a previous relationship. The children's grandfather, a black man named Paul Jones, lived upstairs in a separate unit. Paula and Phillip got married sometime after the cross burning and prior to Milbourn's trial, which took place two years later. We'll generally refer to them as the Thrashes as we move along. In an ironic twist, Kyle Shroyer married Paula's half sister, Hope Pierce, between the incident and Milbourn's trial. Kyle Shroyer, by the way, pled guilty to charges growing out of his role in the cross burning. He received a 15-month sentence.

Milbourn's primary argument on appeal is that the evidence was insufficient to support the jury finding (1) that he was motivated by the racial makeup of the people who lived in the Thrash home and (2) that the cross was burned to intimidate (or interfere), on account of race, with the Thrash family's right to occupy their home. Prevailing, of course, on an insufficiency of the evidence claim is a tall order for any defendant. Before getting to the evidence, however, we pause for a brief word about cross burning.

For most of the last century, ever since the emergence of a reenergized Ku Klux Klan around 1915, cross burning

has been recognized as a symbol of racial hatred. In a climactic scene from *The Birth of a Nation* (1915), as Wagner's "The Ride of the Valkyries"[1] plays in the background, the protagonist of the movie rears up his horse and brandishes a flaming cross to summon fellow Klan members to drive out the black oppressors—yes, the black oppressors—and their northern white allies, all in the defense of their "Aryan birthright." After the movie was released, the Klan got a second life. During one of its first meetings, which took place on Georgia's Stone Mountain in 1915, a cross was burned. Since that time, cross burning has been associated with the KKK and racial hatred. *See Virginia v. Black*, 538 U.S. 343 (2003), for a lengthy discussion about the history of cross burning, especially by the KKK.

And now to the evidence, which Milbourn asserts was insufficient to support the verdict on counts one and two. To repeat what we said a moment ago, Milbourn's task is a tall order. That is so because we review the evidence in the light most favorable to the government. *United States v. Masten*, 170 F.3d 790 (7th Cir. 1999).

On March 12, 2006, Shroyer and Milbourn began drinking in Shroyer's trailer. After dusting off a lot of beer and

---

[1] "The Ride of the Valkyries" also plays during the unforgettable scene in *Apocalypse Now* (1979) when a squadron of helicopters attacks a Vietnamese village. The music is played, according to Lieutenant Kilgore (Robert Duvall—a commander who loves "the smell of napalm in the morning") because "it scares the hell out of the slopes!"

some vodka, they put on hard hats and danced around the living room. Silly, however, soon became serious, as they discussed burning a cross in Shroyer's father's field, which was about a 20-minute drive away. Shroyer's live-in girlfriend, Hope Pierce, tried to dissuade. It didn't work. So the pair went to a nearby shed and built a cross out of some wooden molding. They loaded the newly constructed cross, a can of gas, some nails, and a shovel into Milbourn's truck and drove away.

Instead of going to Shroyer's father's field, however, they went to the Thrash-Tracy home and carried the cross to the front yard. Shroyer dug a hole and they both lifted the cross into it. Milbourn poured gasoline on the cross and, after he lit it, the pair laughed while they watched it burn. Upon returning to Shroyer's trailer, one of the two—Hope could not remember which one—told her they had just burned a cross in her sister's yard.

For the Thrashes the evening was anything but joyful. After noticing an orange glow, they discovered a burning cross in their front yard. It was about five feet away from the room in which two of the children—ages 6 and 10—were sleeping. Phillip Thrash rushed outside and saw two men in hard hats. He yelled at them and they fled. Thrash chased them for a short distance but they got away. Paula Thrash called 911.

After the cross burning, Paula was "visibly upset, frantic," and "crying." She and Phillip were concerned for the children's safety. After learning that her oldest child had been awake during the cross burning, she sought counseling for him. The incident also ruined the

children's relationship with their biological father. Ultimately, the Thrashes "didn't feel that it was appropriate for our children to remain" in the house after the cross burning. They decided they "needed to move on" to a different home. And move they did.

Burning a cross on the Thrashes' lawn was not the only stupid thing Milbourn and Shroyer did that fateful March evening: they took pictures to memorialize the event. After the incident, Milbourn went to the Shroyers' trailer and showed pictures of the cross burning. He even gave Kyle Shroyer a set to keep. Milbourn's roommate, Casey Burke, also saw the pictures. Milbourn showed them to Gerald Davis as well. And then, in a statement that might very well have cooked his goose with the jury, Milbourn told Davis that "he had burned a cross on a nigger's yard."

In addition to this evidence, the jury could have easily concluded that Milbourn (and Kyle Shroyer) knew that the Thrash home housed biracial children. Hope Shroyer (recall, she's Paula's half sister) likely told him so. And the frosting on the cake was that he picked, of all things, a cross to burn. And not just any cross, but one he and Shroyer constructed, crudely to be sure, in a shed near the trailer where they had been drinking and dancing. The burning of a cross, of course, is "an age old symbol of racism." *United States v. Gresser*, 935 F.2d 96, 101 (6th Cir. 1991). Also, several witnesses recalled that they heard Milbourn make derogatory comments about blacks. He frequently used the term "nigger" and at least once referred to a black child as a "niglet." He

even mentioned, in high school, that "it would be cool" to join the Ku Klux Klan. There was even more, but the reader, by now, has probably got the point. Without a shadow of a doubt, the evidence that Milbourn acted with a racial motive was more than sufficient to support the jury's verdict.

Milbourn also argues that the evidence was not sufficient to show that he intended to threaten or intimidate the Thrash family. Burning a cross on the front yard of a biracial family is both threatening and an act of intimidation. *United States v. Hayward*, 6 F.3d 1241, 1250 (7th Cir. 1993) ("[T]he act of cross burning promotes fear, intimidation, and psychological injury."), *overruled in part on other grounds by United States v. Colvin*, 353 F.3d 569 (7th Cir. 2003) (en banc). Further, in cross burning cases, a jury may consider the victims' reaction as an indication of threatening intent because "[e]vidence showing the reaction of the victim of a threat is admissible as proof that a threat was made." *United States v. J.H.H.*, 22 F.3d 821, 827 (8th Cir. 1994) (citing *Watts v. United States*, 394 U.S. 705, 708 (1969)). The government presented evidence of the Thrash family's feelings of fear and anger after the cross burning. They sought counseling for their oldest child—who as we said was awake and saw the burning cross—and the family ultimately moved out of the home. Overall, there was plenty of evidence to support a jury verdict that Milbourn intended to threaten or interfere with the Thrash family's occupancy of their home.

Evidence aside, Milbourn also argues that the government engaged in prosecutorial misconduct during

closing arguments. Because he did not object to the prosecutor's arguments, however, we review the issue only for plain error. *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003). To prevail, Milbourn must establish "not only that the remarks denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remarks." *Id.* at 631 (citation and quotation marks omitted).

Milbourn argues that the prosecutor's statements during closing arguments met this stringent standard. The prosecutor said, "[W]e've never claimed during this trial he's a member of any organization [Ku Klux Klan and Aryan Nation] of any kind. He may aspire to be. Based on the evidence you've heard, I think that's something that can be concluded. He aspires to be part of one of these organizations, but he's not." A witness testified that he heard Milbourn discuss "potentially becoming a member" of the Ku Klux Klan. The witness stated that he and Milbourn "had talked about it and thought it would be cool, and we was talking about joining the Klan, and mostly just blowing off steam." The two had also talked about the Aryan Nation. We think the prosecutor's statement that Milbourn "may aspire to be" a part of the KKK or the Aryan Nation was a reasonable inference from the evidence in the record. There was nothing objectionable about the comment. *See United States v. Young*, 470 U.S. 1, 8 & n.5 (1985). Other claims about the prosecutor's closing argument do not merit discussion.

Finally, Milbourn argues that the district judge should have disregarded the statutorily required mandatory

minimum sentence of 10 years for the use of fire in commission of a felony and imposed a lesser sentence by applying the 18 U.S.C. § 3553(a) factors. The statute directs district courts to impose a sentence "sufficient, but not greater than necessary," in order to achieve the four purposes of sentencing: retribution; deterrence; incapacitation; and rehabilitation. This argument is being raised for the first time on appeal so it is waived. *United States v. Gimbel*, 782 F.2d 89 (7th Cir. 1986). But having said that, the argument, were it to be considered on the merits, would have to be rejected. The judge's hands were tied. He could not go below the mandated minimum even if he were inclined to do so. Milbourn's counsel acknowledged as much at sentencing when he said he was "not aware of a basis by which the Court c[ould] get around" the statutory minimum sentence.

For these reasons, the judgment of the district court is AFFIRMED.