

I N T H E

# Court of Appeals of Indiana

Trenton A. Whitaker-Blakey,

*Appellant-Defendant*



FILED

Dec 11 2024, 9:36 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

State of Indiana,

*Appellee-Plaintiff*

December 11, 2024

Court of Appeals Case No.
24A-CR-1191

Appeal from the Delaware Circuit Court

The Honorable Douglas K. Mawhorr, Judge

Trial Court Cause No.
18C03-2401-F6-58

**Opinion by Judge Pyle**
Judges Weissmann and Felix concur.

**Pyle, Judge.**

## Statement of the Case

[1] Trenton A. Whitaker-Blakey ("Whitaker-Blakey") appeals, following a bench trial, his conviction for Level 6 felony intimidation.[1] Whitaker-Blakey argues that there was insufficient evidence to support his conviction. Concluding that there is sufficient evidence to support Whitaker-Blakey's conviction, we affirm the trial court's judgment.

[2] We affirm.

## Issue

> Whether there is sufficient evidence to support Whitaker-Blakey's conviction.

## Facts

[3] In January 2024, Muncie Police Department Officer Erin Phillips ("Officer Phillips"), who is a black woman, parked her unmarked police car in the Muncie City Hall parking lot. Officer Phillips was dressed "business casual" with her "gun and badge on" over her blouse. (Tr. Vol. 2 at 7). Officer Phillips exited her car and began walking around the rear of it. Suddenly, a man "popped up" from behind a parked, marked police car in the parking lot about ten feet away from Officer Phillips. (Tr. Vol. 2 at 9). The man was wearing a

---

[1] IND. CODE § 35-45-2-1.

"white hood" with the "eyes cut out" and had a backpack. (Tr. Vol. 2 at 9). While Officer Phillips was looking in the man's direction, the man stepped closer to her and said the word "nigger[.]" (Tr. Vol. 2 at 9). The man did not say anything else to Officer Phillips and did not make any gestures or hand movements towards Officer Phillips. Officer Phillips was the only person in the parking lot with the man.

[4] Officer Phillips "tried to keep an eye on" the man while walking "briskly" into the building. (Tr. Vol. 2 at 12). The man started walking away and removed the white hood. When Officer Phillips arrived at her office, she reported the incident to her supervisor.

[5] An hour later, Muncie Police Department Sergeant Ryan Winningham ("Sergeant Winningham") met with Officer Phillips. Sergeant Winningham gathered the surveillance footage of the parking lot and showed it to Officer Phillips. Sergeant Winningham suspected Whitaker-Blakey and knew that he had been staying at the nearby Muncie Mission. Sergeant Winningham obtained surveillance footage from the Muncie Mission showing Whitaker-Blakey wearing the same clothes as the man in the surveillance footage from Muncie City Hall.

[6] Later that evening, officers located Whitaker-Blakey and transported him to the police department for an interview. Officers found in Whitaker-Blakey's possession a white pillowcase with holes cut out for the eyes. During the interview, Whitaker-Blakey admitted to wearing the white hood and saying the

racial slur. However, Whitaker-Blakey told Sergeant Winningham that he had worn the white hood because it was cold outside. Whitaker-Blakey also told Sergeant Winningham that he had not directed the racial slur at Officer Phillips, but instead, had directed the racial slur to other white men across the street. Whitaker-Blakey told Sergeant Winningham that he believed that Officer Phillips possibly was a "CIA operative – FBI – or a detective." (Tr. Vol. 2 at 30). Whitaker-Blakey also told Sergeant Winningham that he had gone to a "meeting" of a white supremacist group and "had more knowledge than [Sergeant Winningham] had of these groups." (Tr. Vol. 2 at 31). Whitaker-Blakey told Sergeant Winningham that he was not a member of a white supremacist group.

[7] The State charged Whitaker-Blakey with Level 6 felony intimidation under INDIANA CODE § 35-45-2-1(a)(4), (b)(1)(C). Specifically, the State alleged that Whitaker-Blakey had communicated a threat to Officer Phillips with the intent that Officer Phillips be placed in fear that the threat would be carried out and that Whitaker-Blakey had communicated the threat to Officer Phillips in relation to her occupation or profession. Additionally, a charge under INDIANA CODE § 35-45-2-1(a)(4) requires that the threat made be a threat as defined in subsection (c) of the intimidation statute. Here, the relevant subsection (c) definition used in this bench trial was that the threat meant "an expression, by words or action, of an intention to . . . unlawfully injure the person threatened[.]" I.C. § 35-45-2-1(c)(1).

[8] The trial court held a bench trial in April 2024. Officer Phillips testified that she had been the only person nearby and definitely the only person of color in the parking lot when Whitaker-Blakey had said the racial slur. Officer Phillips further testified that Whitaker-Blakey had used the word in a "general tone." (Tr. Vol. 2 at 18). When the State asked Officer Phillips if she had been scared when she had heard the racial slur, she responded, "[y]eah." (Tr. Vol. 2 at 10). When the State asked Officer Phillips if she had been afraid of being physically harmed, she responded, "[y]es." (Tr. Vol. 2 at 11). Officer Phillips further testified as follows:

> I think the element of a person that I don't know – can't identify because his face is covered – popping up in a white hood with the eyes cut out and calling me a racial slur was disturbing and made me fear . . . for my safety in that moment.

(Tr. Vol. 2 at 10). Officer Phillips testified that the white hood "resembled a Klan hood – a hood worn by a member of the Ku Klux Klan." (Tr. Vol. 2 at 11). Officer Phillips testified that, growing up, she was "taught to obviously be afraid of the Ku Klux Klan" due to "their ties to white supremacy[.]" (Tr. Vol. 2 at 11). Officer Phillips further testified that she thought "that they are listed as probably the most dangerous hate group" and "the most well-known white supremacy group . . . in all of history anywhere[.]" (Tr. Vol. 2 at 11). Officer Phillips testified that the white hood and the Ku Klux Klan made her "think about lynchings and murders of black individuals – rapes of black women – basically any bad thing that could happen to a black person[.]" (Tr. Vol. 2 at 11). Officer Phillips testified that these were the thoughts going through her

head when the hooded Whitaker-Blakey had called her a nigger. Officer Phillips also testified that she was concerned about what Whitaker-Blakey had in his backpack.

[9] At the conclusion of the bench trial, the parties focused their arguments on whether Whitaker-Blakey's use of the racial slur had constituted a threat, which was required under all subsections of INDIANA CODE § 35-45-2-1(a). Ultimately, the trial court found Whitaker-Blakey guilty of Level 6 felony intimidation. Specifically, the trial court addressed whether the racial slur was a threat and, pursuant to subsection (a)(4) of the intimidation statute, it analyzed whether the threat was a threat under subsection (c). The trial court also stated the following:

> Mr. Whitaker-Blakey, you were []dressed as a person who is typically identified as a Ku Klux member. When I look at these exhibits – that's immediately what comes to mind.
>
> * * * * *
>
> [W]hat I take [from] the circumstances surrounding you being crouched down behind a vehicle – wearing a hood – popping up – stepping towards Officer Phillips and saying nigger – is that you want her to feel like you're going to commit a crime against her – injure her – make her fight – make her do something against her will which is defend herself. That's why it was a threat. If you'd stated that to not just a black female, but to any[] black person in the manner in which you did – that is a threat, and I believe it was your intention to cause that threat because of the way you conducted yourself.

(Tr. Vol. 2 at 57). The trial court further found that it did not consider Whitaker-Blakey's justification for wearing the white hood – due to the cold weather – to be credible. Instead, the trial court found that wearing the white hood "communicates that you are a threat because you are a person who believes in the white supremacy views and values of the Ku Klux Klan[.]" (Tr. Vol. 2 at 58). The trial court also referenced the language in subsection (a)(1) instead of (a)(4) of the intimidation statute when it found Whitaker-Blakey guilty. Thereafter, the trial court sentenced Whitaker-Blakey to thirty (30) months, all of which was suspended to supervised probation.

[10] Whitaker-Blakey now appeals.

## Decision

[11] At the outset, we note that the State charged Whitaker-Blakey under INDIANA CODE § 35-45-2-1(a)(4), which provides that "[a] person who communicates a threat with the intent . . . that another person be placed in fear that the threat will be carried out . . . commits intimidation, a Class A misdemeanor." The trial court, when it had found Whitaker-Blakey guilty at his bench trial, tracked the language under INDIANA CODE § 35-45-2-1(a)(1), which provides that "[a] person who communicates a threat with the intent . . . that another person engage in conduct against the other person's will . . . commits intimidation, a Class A misdemeanor." However, because the State charged Whitaker-Blakey under Indiana Code §35-45-2-1(a)(4), we will assess whether there is sufficient evidence to support his conviction under this subsection.

[12]     Whitaker-Blakey raises three issues which we condense and restate as whether there was insufficient evidence to support his conviction.[2] Our standard of review for sufficiency of the evidence claims is well settled. We consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not reweigh the evidence or judge witness credibility. *Id.* We will affirm the conviction unless no reasonable fact finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* at 146-47. The evidence is sufficient if an inference may be reasonably drawn from it to support the verdict. *Id.* at 147.

[13]     As stated previously, Indiana's intimidation statute, INDIANA CODE § 35-45-2-1(a)(4), provides that "[a] person who communicates a threat with the intent . . . that another person be placed in fear that the threat will be carried out . . . commits intimidation, a Class A misdemeanor." Additionally, a charge under INDIANA CODE § 35-45-2-1(a)(4) requires that the threat made be a threat as defined in subsection (c) of the intimidation statute. Subsection (c) defines "threat" in part as "an expression, by words or action, of an intention to . . . unlawfully injure the person threatened or another person, or damage

---

[2] Whitaker-Blakey also argues that the trial court committed fundamental error when it used language that tracked the language of subsection (a)(1) when it found Whitaker-Blakey guilty. However, our review of the record reveals that the trial court focused its analysis on the question of whether the use of a racial slur was a threat under the intimidation statute, which was required under all subsections of subsection (a). During its analysis, the trial court also determined that Whitaker-Blakey's acts constituted a threat as defined by subsection (c), which is an explicit requirement under subsection (a)(4), the subsection under which the State charged Whitaker-Blakey and argued at trial. We are not convinced that the trial court's use of language that tracked subsection (a)(1) at the bench trial amounts to fundamental error.

property[.]"  I.C. § 35-45-2-1(c)(1).  The intimidation statute further provides that the offense is a Level 6 felony if "the threat is communicated because of the occupation, profession, employment status, or ownership status of a person or the threat relates to or is made in connection with the occupation, profession, employment status, or ownership status of a person[.]"  I.C. § 35-45-2-1(b)(1)(C).  Accordingly, in this case, the State was required to prove beyond a reasonable doubt that Whitaker-Blakey communicated a threat to unlawfully injure Officer Phillips and that Whitaker-Blakey did so with the intent that Officer Phillips be placed in fear that the threat will be carried out.

[14]  Whitaker-Blakey first argues that there is insufficient evidence showing that the word nigger constituted a threat.  We disagree.

[15]  "Whether a statement is a threat is an objective question for the trier of fact." *Newell v. State*, 7 N.E.3d 367, 369 (Ind. Ct. App. 2014), *trans. denied*.  In determining whether a statement was intended as a true threat, we consider "the content of the statement, its context, and the reaction of the listeners." *Id.* (citing *Watts v. United States*, 394 U.S. 705, 708 (1969).  As stated above, subsection (c) of the intimidation statute defines "threat" in part as "an expression, by words or action, of an intention to . . . unlawfully injure the person threatened or another person, or damage property[.]"  I.C. § 35-45-2-1(c)(1).

[16]  Before assessing the merits of this case, we note that it is undeniable that the word "*nigger* used conventionally – namely as an insult – continues to be an oft-

heard feature of the soundtrack of American racism at its most base and violent. Any serious discussion of the N-word and proper ways to respond to its various uses must include an appreciation of the persistent weaponization of *nigger* by racists." Randall Kennedy, NIGGER: THE STRANGE CAREER OF A TROUBLESOME WORD x (Pantheon Books rev. ed. 2022). The use of such a racial slur "flows from the fountain of purpose to *injure*." *Middleton v. State*, 64 N.E.3d 895, 902 (Ind. Ct. App. 2016) (Pyle, J., concurring) (citations omitted) (emphasis in original), *reh'g denied*, *summarily aff'd on transfer*, 72 N.E.3d 891 (Ind. 2017).

[17] Additionally, it is historically settled that the Ku Klux Klan is a violent white supremacist organization with a history of terrorizing people of color, black people in particular. *Virginia v. Black*, 538 U.S. 343, 353 (2003). Since the Ku Klux Klan's inception in 1866, it has "employed tactics such as whipping, threatening to burn people at the stake, and murder." *Id.* (citation omitted). The symbols associated with the Ku Klux Klan are also well known and include the burning cross, white hood, and mask. *Id.* at 353-54. One of our nation's first motion pictures, Birth of a Nation in 1915, was promoted through a poster advertising the film, displaying "a hooded Klansman riding a hooded horse, with his left hand holding the reins of the horse and his right hand holding a burning cross above his head." *Id*. at 354. As our country moved into the twentieth century, the Klan's objective of preserving white supremacy moved beyond race. Its "central message was that white Protestant hegemony was threatened by Roman Catholics, Jews, African Americans, immigrants,

Prohibition violation, gambling and other crimes, political corruption, sexual immorality, materialism, and the erosion and traditional family values." THE OXFORD COMPANION TO UNITED STATES HISTORY 425 (Paul S. Boyer ed.) 2001.

[18] Further, Indiana has its own unique connection with the Ku Klux Klan, which was led in the 1920's by D.C. Stephenson, its Grand Dragon.

> The Klan owned the state, and Stephenson owned the Klan. Cops, judges, prosecutors, ministers, mayors, newspaper editors – they all answered to the Grand Dragon. He was backed by his own private police force, some 30,000 men legally deputized to harass violators of Klan-certified virtue. Most members of the incoming state legislature took orders from the hooded order, as did the majority of the congressional delegation. From the low-bank shores of Lake Michigan in the north to the fat bends of the Ohio River in the south, from the rural folds of a county where Abraham Lincoln grew up in a small house that nurtured big ideas, to the windowless shack along the tracks where Louis Armstrong cut his first jazz record, the Klan infested Indiana. All but two of the ninety-two counties had a chapter – the only state with such saturation. One in three native-born white men wore the sheets.

Timothy Egan, A FEVER IN THE HEARTLAND: THE KU KLUX KLAN'S PLOT TO TAKE OVER AMERICA, AND THE WOMAN WHO STOPPED THEM xv (2023). As we held in *Newell*, 7 N.E.3d at 369, this historical context serves as our backdrop in determining whether Whitaker-Blakey's words and actions constituted a threat.

[19] Turning back to the case at hand, our review of the record reveals that Whitaker-Blakey crouched behind a parked police car while wearing a white hood with holes cut out for his eyes. When Officer Phillips parked nearby and walked around her unmarked police car, Whitaker-Blakey stood up, approached Officer Phillips, and said the word nigger. Officer Phillips briskly walked into Muncie City Hall because she feared for her safety. Whitaker-Blakey walked away and removed the white hood.

[20] Whitaker-Blakey's statement was directed towards Officer Phillips. The context of Whitaker-Blakey's statement was one in which Whitaker-Blakey popped up from behind a parked car and approached a black, female officer, who was alone in a parking lot, while wearing a white hood with eye holes cut out of it. Whitaker-Blakey told Sergeant Winningham that he had gone to a "meeting" of a white supremacist group and "had more knowledge than [Sergeant Winningham] had of these groups." (Tr. Vol. 2 at 31). Further, Officer Phillips reacted with fear due to Whitaker-Blakey's act. Officer Phillips specifically testified that she had feared for her safety and associated the white sheet with the Ku Klux Klan, lynchings, murders, and rapes of black women. As a result, we hold that Whitaker-Blakey's use of the word nigger while wearing a white sheet on his head demonstrates a clear intent to communicate a threat to Officer Phillips, who was a law enforcement officer.

[21] Whitaker-Blakey attempts to argue that he had not directed the word nigger at Officer Phillips and that he had only worn the white sheet on his head to "stay warm" during a "cold January morning[.]" (Whitaker-Blakey's Br. 13). But,

Whitaker-Blakey made these same arguments at his bench trial, and the trier of fact did not find these arguments to be credible. Whitaker-Blakey's arguments amount to a request to reweigh the evidence and reassess witness credibility, which we will not do. *See Drane*, 867 N.E.2d at 146.

[22] Whitaker-Blakey also argues that there is insufficient evidence that he intended that Officer Phillips be "placed in fear that the threat w[ould] be carried out." (Whitaker-Blakey's Br. 15). In support of his contention, Whitaker-Blakey notes that aside from Officer Phillips' testimony regarding her fear of physical harm, "no one at the trial actually attempted to specifically articulate what Whitaker-Blakey's threat actually entailed." (Whitaker-Blakey's Br. 15) (internal quotation marks omitted). However, the trial court inferred through Whitaker-Blakey's actions – crouching behind a car, popping up wearing a white hood, stepping towards Officer Phillips, and calling her a nigger – that Whitaker-Blakey expressed an intention to unlawfully injure Officer Phillips. Based on our review of the record and historical context of his actions and the word that was uttered, we are led to the same reasonable inference made by the trial court. Accordingly, we affirm the trial court's judgment.

[23] Affirmed.

Weissmann, J., and Felix, J., concur.

ATTORNEY FOR APPELLANT

Scott S. Mandarich
McClure McClure & Davis
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana