811 So.2d 736 (2002)
Paul CURRY, Appellant,
v.
STATE of Florida, Appellee.
Nos. 4D99-2601, 4D99-3600, 4D99-4212, 4D99-4213.
District Court of Appeal of Florida, Fourth District.
February 27, 2002.
*738 Carey Haughwout, Public Defender, Cherry Grant, and David J. McPherrin, Assistant Public Defenders, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Don M. Rogers, Assistant Attorney General, West Palm Beach, for appellee.
GROSS, J.
The issue in this case is whether the defendant's conductwhich involved making complaints about the victim to various law enforcement agencies, the Cities of Stuart and Vero Beach, and the Department of Highway Safety and Motor Vehicles constituted the crime of aggravated stalking within the meaning of section 784.048(4), Florida Statutes (2000).[1] Because such conduct was constitutionally protected and served a "legitimate purpose" within the meaning of the stalking statute, we hold that it did not amount to the crime of aggravated stalking as a matter of law.
We state the facts at trial in the light most favorable to the state. See Perry v. State, 801 So.2d 78, 84 (Fla.2001); Dupree v. State, 705 So.2d 90, 93 (Fla. 4th DCA 1998) (en banc).
In November 1995, appellant, Paul Curry, moved into a house with Andrew Nowicki. Nowicki's cousin, Jacqueline DiCarlo, lived in a cottage behind Nowicki's house. Both houses were on the same property but had different addresses. After Nowicki died in March 1996, the once friendly relationship between DiCarlo and Curry disintegrated into a series of complaints and injunctions. Curry then moved to a new residence.
On June 19, 1996, DiCarlo obtained an ex parte temporary injunction against Curry pursuant to section 784.046, Florida Statutes. After two extensions, a permanent injunction issued on December 11, 1996, and was modified in 1997 and 1998.
Before the first temporary injunction issued, on April 5, 1996, DiCarlo called the police to obtain a trespass warning against Curry. On May 9, 1996, Curry filed a complaint with the City of Stuart alleging that DiCarlo installed a business sign at her home, in violation of city ordinances. DiCarlo then modified the sign prior to any action by the City.
Curry next filed a complaint with the City of Stuart alleging that a portion of the sidewalk in front of DiCarlo's property was obstructed, since it was covered with dirt and sod. On June 14, 1996, the Stuart police observed Curry in front of DiCarlo's property with a tape measure. Curry explained that he was checking the width of the City's right-of-way because the sidewalk had been buried and he was concerned that local school children did not have a sidewalk to walk on. A police officer issued Curry a trespass warning.
Subsequently, the City found that the covered sidewalk was a zoning violation. DiCarlo presented a petition from herself and her neighbors stating that the sidewalk should be removed or covered over. The City approved DiCarlo's plan.
On June 19, 1996, Curry filed a complaint with the Stuart police that a car was parked on the sidewalk of DiCarlo's property. The car was subsequently removed.
On July 1, 1996, Curry filed a complaint with the Martin County Sheriff alleging *739 that DiCarlo made false statements on her driver's license application. Then, Curry filed a complaint with the Department of Highway Safety and Motor Vehicles alleging that DiCarlo had lied on her driver's license application, as she had given the wrong address. Curry traveled to the Department's headquarters in Tallahassee and spoke with Jon Davis, the Department's Inspector General. Curry told Davis that DiCarlo did not live at the address in her application, but at a cottage behind the given address which had a different address. After a follow-up call from Curry, Davis contacted DiCarlo and asked her to change the address on her license to that of her cottage.
On July 5, 1996, Curry went to the Stuart police with a copy of DiCarlo's job application to the Martin County School Board, alleging that DiCarlo lied about her address on the application. He contended that she should be investigated for perjury. Curry was told that his complaint was better taken up with the School Board, as he was not the victim of the alleged crime.
Next, Curry filed a complaint with the City of Stuart concerning DiCarlo not having an occupational license for her occupation as a tarot card reader. After an investigation, the City required DiCarlo to register a fictitious name for her business and obtain an occupational license.
On October 1, 1996, Curry filed a complaint with the Martin County Sheriff alleging that DiCarlo was harassing him and that she perjured herself at a court hearing.
On October 31, 1996, DiCarlo saw Curry at a costume party in a local night club. The two neither spoke nor had any contact with each other.
On November 5, 1996, Curry filed a complaint with the City of Stuart alleging that DiCarlo was again conducting business within the City without a license. The City determined that there was no violation.
On December 9, 1996, Curry filed a complaint with the Port St. Lucie police alleging that an incident had taken place with DiCarlo at a bar in Port St. Lucie. Curry was told that his complaint did not constitute a crime, but that the complaint would be passed along to the duty officer's superiors.
On February 6, 1997, the St. Lucie County Sheriff's office responded to a call at DiCarlo's address and spoke with a Janice Warren who stated that Curry drove past the property. Neither Curry nor DiCarlo were found on the property.
On February 18, 1997, Curry filed a complaint with the City of Stuart against Osceola Street Herbs, Biotanicals and Perfumery, Incorporated, where DiCarlo had worked as an independent contractor for five years. Curry alleged that because the corporation had been administratively dissolved in 1995 for failure to file an annual report, the use of the word "incorporated" was unlawful. He also complained that the business did not comply with the statute covering fictitious names. Osceola Street Herbs continued to operate, but filed additional paperwork with the state, including a fictitious name publication.
On April 4, 1997, DiCarlo called the police after seeing Curry within two blocks of her house. The police did not find Curry near the house.[2]
On May 27, 1997, Curry filed a complaint with the City of Stuart about an inoperable car parked on the right-of-way *740 at DiCarlo's house. The complaint also noted that the property owners refused to abide by the city's address system. Curry followed up with a letter dated May 30, 1997, where he stated, "[o]n Tuesday, May 27th, 1997, I turned in the attached complaint to Code Enforcement; as of late today, Friday, it appears that nothing has been done. Why does the City ignore blatant Code enforcement violations by the Nowicki/DiCarlo clique?" The car was found to be parked on the right-of-way.
On June 25, 1997, Curry filed a complaint with the City of Stuart about an inoperable motor vehicle located at DiCarlo's house. An investigation revealed that the vehicle's license plate was missing. The City found Curry's complaint to be proper.
On July 21, 1997, Curry went to the Martin County Sheriff and asked if DiCarlo had filed any complaints against him.
In October 1997, Curry informed the City of Vero Beach that DiCarlo did not have an occupational license to work as an independent contractor at the "Psychic Bookstore." Curry also sent a letter to the City of Vero Beach stating that the Psychic Bookstore did not have a license allowing it to rent space to independent contractors, such as DiCarlo. An investigation ensued and the City advised DiCarlo to obtain an occupational license.
On May 29, 1998, Curry filed a perjury charge against DiCarlo with the Stuart police. On November 14, 1999, Curry filed another perjury complaint with the Stuart police against DiCarlo.
During the course of these events, Di-Carlo obtained an emergency cell phone from the Stuart Police Department in order to call 911. Curry made a public records request to inspect all Stuart Police Department records concerning use of the emergency use cell phone assigned to Di-Carlo.
The sum of all of this was, as Curry testified at trial, that Curry made at least forty public records requests concerning DiCarlo and also filed about forty complaints against her with various government agencies. Understandably, DiCarlo testified that Curry's conduct had caused her substantial emotional distress.
The state charged Curry with aggravated stalking. The statement of particulars and its three subsequent amendments set forth in detail the activities described above. The statement included numerous activities that were not proven at trial. It also described conduct that occurred prior to the issuance of the injunction for protection; these activities were relevant, pursuant to the statute, to prove Curry's malicious intent. Based on facts set forth above, the jury convicted Curry of aggravated stalking.
The aggravated stalking statute, section 784.048(4), Florida Statutes (2000), provides:
Any person who, after an injunction for protection against repeat violence pursuant to s. 784.046, or an injunction for protection against domestic violence pursuant to s. 741.30, or after any other court-imposed prohibition of conduct toward the subject person or that person's property, knowingly, willfully, maliciously, and repeatedly follows or harasses another person commits the offense of aggravated stalking, a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
Section 784.048(1)(a) defines "harass" as engaging "in a course of conduct directed at a specific person that causes substantial emotional distress in such person and serves no legitimate purpose." Section 784.048(1)(b) defines "course of conduct" as
a pattern of conduct composed of a series of acts over a period of time, however *741 short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of "course of conduct." Such constitutionally protected activity includes picketing or other organized protests.
In construing the statute, we are mindful of the rule of construction contained in section 775.021(1), Florida Statutes (2000), which provides that a statute defining a criminal offense "shall be strictly construed" and that when the statutory "language is susceptible of differing constructions, it shall be construed most favorably to the accused."
The stalking statute, section 784.048, was enacted by Chapter 92-208, Laws of Florida. It evolved from that part of the criminal law concerned with crimes against the person and from domestic and repeat violence legislation. The House of Representatives, Committee on Criminal Justice Final Bill Analysis described the legal situation as it existed in 1992, by observing that stalking was not recognized as a criminal offense in Florida because it did not meet the elements of assault, aggravated assault, battery or aggravated battery. STATE OF FLORIDA HOUSE OF REPRESENTATIVES, COMMITTEE ON CRIMINAL JUSTICE FINAL BILL ANALYSIS & ECONOMIC IMPACT STATEMENT, CS/HB 97 at 2 (1992) (hereinafter, "BILL ANALYSIS").
The stalking statute was intended to fill gaps in the law by criminalizing conduct that fell short of assault or battery. The stalking statute was also designed to protect women from being harassed by ex-husbands or former boyfriends, by ensuring that victims did not have to be injured or threatened with death before stopping a stalker's harassment. See James T. Tucker, Note, Stalking the Problems With Stalking Laws: The Effectiveness of Florida Statutes Section 784.048, 45 FLA. L.REV. 609, 628-29 (1993).
The primary sponsor of the stalking statute, Representative Carol Hanson, stated that "the intent of the bill is to stop the stalker before a more serious criminal offense, such as murder, befalls the victim." BILL ANALYSIS at 6. The legislative history of the statute thus supports an interpretation of the statute where "stalking" retains the concept of some type of contact, whether it is verbal, direct, or indirect, between the stalker and the victim.
In the case at hand, Curry had no contact with DiCarlo that would support an aggravated stalking conviction. Once Curry was ordered to physically stay away from DiCarlo and her home on September 3, 1997, he did so. Even before that order, he had few direct contacts with DiCarlo. DiCarlo testified that Curry never verbally threatened her.
The behavior DiCarlo found objectionable was Curry's numerous complaints and reports to government agencies engaged in law enforcement, code enforcement, or other governmental activities. As a matter of law, such contacts cannot amount to "harassment" within the meaning of the criminal statute. A report to an arm of government, concerning a matter within the purview of the agency's responsibilities, serves a "legitimate purpose" within the meaning of section 784.048(1)(a), regardless of the subjective motivation of the reporter. We note that many of Curry's complaints concerning violations, although technical, were found to have merit.
A citizen's request for public records also involves a "legitimate purpose," because the right to obtain the records is established by statute and acknowledged in the state constitution. Section 119.07(1)(a), Florida Statutes (2000), requires every person "who has custody of a public record" to "permit the record to be inspected and examined by any person *742 desiring to do so." The motivation of the person seeking the records does not impact the person's right to see them under the Public Records Act. See Booksmart Enters., Inc. v. Barnes & Noble College Bookstores, Inc., 718 So.2d 227, 228 n. 2 (Fla. 3d DCA 1998); Staton v. McMillan, 597 So.2d 940, 941 (Fla. 1st DCA 1992); Lorei v. Smith, 464 So.2d 1330, 1332 (Fla. 2d DCA 1985). Article I, Section 23 of the Florida Constitution demonstrates the importance of the Public Records Act when it states that the constitutional right of privacy "shall not be construed to limit the public's right of access to public records and meetings as provided by law."
Another separate basis exists that compels the finding that no criminal violation occurred in this case. Under the stalking statute, Curry's complaints and reports to governmental entities did not constitute a "course of conduct," an aspect of the definition of harassment. See § 784.048(1)(a), Fla. Stat. (2000). Harassing involves engaging in a "course of conduct" directed at a specific person. See § 784.048(1)(a), Fla. Stat. (2000). "Constitutionally protected activity is not included within the meaning of `course of conduct.'" § 784.048(1)(b), Fla. Stat. (2000) (emphasis supplied). The statute gives "picketing or other organized protests" as examples of constitutionally protected activities. The list is not exclusive. Other constitutionally protected activities are also excluded from the definition of "course of conduct."
The right to petition the government for a redress of grievances is one such constitutionally protected activity, and one of the most precious liberties "safeguarded by the Bill of Rights." United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). The history of the right to petition for the redress of grievances is ancient, stretching back in time to before the Magna Carta, see A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc., 263 F.3d 239, 252 (3d Cir.2001), to a petition by English leaders in 1013 to "Aethelred the Unready."[3] Norman B. Smith, "Shall Make No Law Abridging...": An Analysis of the Neglected, but Nearly Absolute, Right of Petition, 54 U. CIN. L.REV. 1153, 1154 (1986). The right to petition has evolved to its current place in both the federal and Florida constitutions, which protect the right of the people to petition the government for redress of grievances. See U.S. Const., amend. I.; Art. I, § 5, Fla. Const.
The right to petition was originally granted solely to petition the judiciary. Gable v. Lewis, 201 F.3d 769, 771 (6th Cir.2000) (relying on Stephen A. Higginson, Note, A Short History of the Right to Petition Government For the Redress of Grievances, 96 YALE L.J. 142 (1986)). However, the Supreme Court extended the right to petition to all departments of the government. See California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The Florida Supreme Court has stated that presenting a complaint to the government concerning its conduct is "now expressly held central to the right to petition that government for the redress of grievances against it." Cate v. Oldham, 450 So.2d 224, 226 (Fla.1984).
Administrative agencies perform functions of the executive branch and *743 the right to petition extends to those agencies as well. See White v. Lee, 227 F.3d 1214, 1231 (9th Cir.2000); Jackson v. City of Columbus, 194 F.3d 737, 748 (6th Cir. 1999); Ruiz v. Hull, 191 Ariz. 441, 957 P.2d 984, 1000 (1998). The right to "petition an administrative agency to take official action in the exercise of its powers is guaranteed by the First Amendment." Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd. of Culinary Workers, 542 F.2d 1076, 1082 (9th Cir.1976). This constitutional right includes the right to notify the appropriate agencies about violations of the law. See Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 159 (3d Cir. 1988).
Similarly, the enforcement of laws is also a function of the executive branch of government. See Art. IV, § 1, Fla. Const.; see also Tyson v. Viacom, Inc., 760 So.2d 276, 277 (Fla. 4th DCA 2000). As in petitioning administrative agencies, complaints to law enforcement agencies are a protected constitutional activity. The submission of complaints "to nonlegislative and nonjudicial public agencies like a police department constitutes petitioning activity protected by the petition clause." Gable, 201 F.3d at 771(relying on California Motor Transp., 404 U.S. at 510, 92 S.Ct. 609).
Curry's complaints concerning violations of various statutes, ordinances and codes was, therefore, constitutionally protected activity falling outside the statutory definition of criminal harassment. Curry had the constitutional right to convince governmental agencies to enforce laws within their jurisdiction. Curry's unsavory motivation in contacting law enforcement or administrative agencies does not eviscerate the constitutional protection of his conduct. See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 139, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (noting that "[i]t is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors.").
Our interpretation of the criminal statute is consistent with the legislative intent to discourage stalking before it develops into a more serious threat to a victim's personal safety. One function of the criminal law is to channel conduct into socially acceptable forums for asserting grievances. Where a person has complained to an arm of the government about another, there is not the immediate threat to personal security that arises when an emotional, angry complainant delivers his grievances directly. Section 784.048 should not be read to criminalize conduct which makes the government the intermediary between stalker and stalkee. In such circumstances, civil tort actions such as malicious prosecution or defamation protect an innocent victim from wrongful conduct.
Curry's conduct in this case was clearly knowing, willful, and repeatedand it may even be thought by some as weird and obsessive, with more than a tinge of spite to itbut it did not qualify as a violation of the anti-stalking statute. Viewed objectively, Curry's conduct had a "legitimate purpose" under section 784.048(1)(a); also, it did not amount to a "course of conduct," defined by section 784.048(1)(b), because it excludes "constitutionally protected activity."
The trial court erred in denying Curry's motion for judgment of acquittal. The conviction for aggravated stalking is reversed.
WARNER and FARMER, JJ., concur.
NOTES
[1] Appellant was convicted under the 1996 version of the aggravated stalking statute, which contains the same wording as the current statute.
[2] The permanent injunction in force at that time did not preclude Curry from being in the vicinity of DiCarlo's home.
[3] Aethelred the Unready was king of England from 978-1016. The epithet "unready" was coined after his reign as a pun on the literal translation of his name. Aethelred meant "good counsel" and "Unraed"or "unrd" meant "no counsel" or "ill advised counsel." His reign was plagued by poor advice from his personal favorites. See Sean Miller, Anglo Saxons.net (Feb. 7, 2002), available at www. anglo-saxons.net/bio/kingenglandaethelred unready.html.