DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MICHAEL DITANNA,**
Appellant,

v.

**BLAKE EDWARDS,**
Appellee.

No. 4D20-1619

[June 30, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Charles E. Burton, Judge; L.T. Case No. 50-2020-DR-004435-XXXX-SB.

Christopher B. Hopkins and Craig S. Distel of McDonald Hopkins LLC, West Palm Beach, for appellant.

Dave K. Roy of Roy & Associates, P.A., West Palm Beach, for appellee.

WARNER, J.

In this appeal from a final judgment of injunction for protection against domestic violence, appellant contends that the trial court erred in finding that he had engaged in stalking or cyberstalking, because he had a legitimate purpose in reporting appellee's actions to authorities and persons affected by appellee's conduct. He also contends that the resulting injunction infringes on his First Amendment rights. Additionally, appellant argues no proof existed that his actions caused substantial emotional distress.

Because appellant's communications provided information about appellee to law enforcement, to appellee's hospital employer, and to a gym about appellee's behavior, those communications did serve, at least in part, a legitimate purpose. Thus, those actions cannot support the final judgment of injunction or its restrictions on communications to law enforcement authorities or the hospital employer of appellee. As to appellant's remaining actions, we conclude that no legitimate purpose was shown, and those actions support the final judgment, as collectively, they would cause a reasonable person substantial emotional distress. To the

extent that the final judgment constitutes a prior restraint in preventing appellant from speaking with appellee's employer, we conclude that the court erred. We thus reverse that portion of the final judgment restricting communications with third parties about appellee but otherwise affirm as to all other issues raised.

Prior to the events that led to appellee filing a verified petition for protection against domestic violence, he and appellant had been in a relationship for a little over two years, and they had lived together during some of that time period. Appellee was a doctor at a hospital at the time their relationship ended on May 14, 2020, and that is when the events occurred that led appellee to seek the injunction.

On June 6, 2020, appellee filed a petition for injunction for protection against domestic violence alleging that appellant was stalking appellee. Attached to the petition, but not introduced into evidence at the hearing, were text messages purportedly between appellee and appellant. Generally, the texts from appellant expressed concern that appellee was cheating on appellant, but the messages also stated that appellee was lying to people, and appellant was going to share with others information that he found on the laptop that appellee was using.

The trial court entered an ex parte temporary injunction and set a hearing to determine if a final judgment should be entered. At the hearing, appellee did not have a lawyer present, but appellant was represented.

Appellee stated that he was on leave from the hospital because of allegations made by appellant to the hospital. He testified that on May 14th, he woke up to find appellant saying that he had gone through appellee's phone, and he was leaving. Appellee asked appellant not to leave. Appellant pushed appellee to the floor and took a photo of appellee. Appellant also took some of his belongings when he left. After he left, appellant began questioning appellee about cheating, and his threats escalated. "[H]e contacted my work. He's - - he's threatened to contact the gym I go to. He's threatened to contact the bank where I have my mortgage. He has contacted many of my neighbors with false allegations telling them that they need to protect their children from me. He has contacted my family. He has threatened my mother and stepfather. He has told me that he was going to make one of my best friends lose their job, as well."

Sometime before the May incident, appellee testified that appellant had grabbed him and twisted his arm. A year earlier, appellant had cracked his laptop.

2

Since the temporary injunction was granted, appellee testified that he had been contacted from "numerous, anonymous accounts with . . . information . . . sensitive to my work that no one else has known." Appellant has sent out "highly detailed sexual information" to random people that appellee stated that neither he nor appellant have ever contacted before now.

On cross-examination, appellee admitted that he had never filed a police report against appellant for physical violence. He was aware that appellant lives in New York but stated that appellant visited Florida frequently. Appellee agreed that appellant never asked in any of the text messages exchanged between them for anything in exchange for not sharing that information. Despite appellee telling appellant to stop contacting him, he admitted that he later texted appellant because of the threatening nature of appellant's texts.

Appellant then testified, initially in response to court questions. He confirmed that he had known appellee since September 2017. The court asked if he sent the text and "all of this" and appellant answered yes. (Although the texts attached to the petition were not admitted into evidence, we assume "all of this" refers to those texts.)

Appellant testified that during their breakup he made "some really disturbing discoveries" on his laptop which appellee had been using. He was in the process of reporting them to the authorities. At that point, the court asked appellant if he believed appellee was cheating on him, and he responded that he did. He said that he reported information not in regard to cheating but to "health risks to myself and criminal activity that I've discovered." The court then asked if appellant believed that appellee was sleeping around, and he replied that he did not. The court asked why he simply did not go back to New York and break off the relationship. Appellant replied that he did remove himself, but he discovered things "so egregious, I felt a moral and ethical obligation to report them to the authorities. And that's what I did."

The court asked if appellant texted appellee's neighbors and work and he responded that he submitted formal complaints through "the correct channels at the hospital." He told the judge that friends were telling him that appellee was having contact with "many, many people in the middle of quarantine."

When the court finished its questions, appellant's attorney commenced his examination of appellant. Appellant testified that he spent ninety-five

percent of his time in Manhattan. He comes to Florida occasionally, staying mostly in the northern part of the state but comes to Miami about twice a year.

Appellant showed the court a video he took of the night he left appellee, but the video is not part of the record. Appellant testified that he did not push appellee to the floor, but appellee tried to prevent him from leaving.

The attorney then showed appellant a document on an iPad which he identified as a conversation between appellee and appellee's personal friend which he had seen on the laptop appellee had been using. This document was not offered into evidence. Appellant testified that he submitted it to the CEO at the hospital where appellee worked, because the conversation within the document included a sexual comment made by appellee regarding an underage patient. Another conversation involved sexual relationships at the hospital. With COVID-19, "I think it was a significant risk to - - a risk to myself, and the community, and the patients at the hospital, quite frankly." Based upon the information he saw on the laptop, he also turned it over to the police, who still had the laptop as of the hearing date.

After appellant's counsel completed his direct of appellant, appellee questioned appellant. Appellee asked if appellant had threatened to contact the gym he frequented to report that appellee was taking inappropriate photos of people. Appellant responded that he was not threatening, because he actually did report to the gym that he witnessed photos taken of other members with sexual comments attached, which was a violation of the gym's express policies. Appellant admitted that he joined the same national gym chain in order to report what he found.

Appellee asked whether appellant had contacted neighbors telling them to protect their children from him. Appellant replied that he had only contacted one neighbor whose phone number he obtained from a text message to appellee. He admitted to contacting a friend of appellee who worked at the same hospital, whom he reached out to for "general advice." Appellant also contacted another friend with whom appellee had a sexual relationship when he was not with appellant. Appellant contacted this friend, because he was concerned about appellee cheating on exams and asked the friend if that was true. There is no testimony as to why appellant would think that this friend had any information or relevance to cheating by appellee. Appellant added that he reached out to all of these people, because he also discovered that appellee had hidden recording devices in his apartment, and he wanted to warn them of "potentially a risk."

4

Appellant admitted contacting appellee's work, emailing appellee's boss at the hospital three times, and having five to ten different conversations with the hospital telling them about anything that he thought was "criminal activity." The most recent contact that appellant had with the hospital was in the end of June with "the director of risk at the hospital who is leading the investigation."

After hearing the evidence, the trial court found that appellee proved his case of stalking. The court stated, "if the Court believed that [appellant's] intentions were pure, that's one thing. The Court does not. The Court finds his testimony to be not credible." The court entered an injunction for two years. The injunction provided that appellant shall have no contact with petitioner directly or indirectly "in person, by mail, e-mail, fax, telephone, through another person, or in any other manner." "Further, Respondent shall not contact or have any third party contact anyone connected with Petitioner's employment or school to inquire about Petitioner or to send any messages to Petitioner." Appellant was ordered to "not go to, in, or within 500 feet of: [appellee's residence] . . . [appellee's] current or any subsequent place of employment[.]" (emphasis omitted). After his motion for rehearing was denied, appellant filed this appeal.

"Trial courts have 'broad discretion in granting . . . injunctions, and unless a clear abuse of discretion is demonstrated, appellate courts will not disturb the trial court's decision.'" *Hobbs v. Hobbs*, 290 So. 3d 1092, 1094 (Fla. 1st DCA 2020) (quoting *Noe v. Noe*, 217 So. 3d 196, 199 (Fla. 1st DCA 2017)). The standard of review for an injunction for protection against domestic violence is abuse of discretion. *Weisberg v. Albert*, 123 So. 3d 663, 664 (Fla. 4th DCA 2013). The trial court's order granting a permanent injunction is reviewed for competent substantial evidence. *See O'Neill v. Goodwin*, 195 So. 3d 411, 413 (Fla. 4th DCA 2016) (citing *Thoma v. O'Neal*, 180 So. 3d 1157, 1159 (Fla. 4th DCA 2015)). The question of whether the evidence is legally sufficient to justify imposing an injunction is a question of law reviewed de novo. *Pickett v. Copeland*, 236 So. 3d 1142, 1145 (Fla. 1st DCA 2018).

The cause of action for an injunction for protection against domestic violence originates in section 741.30, Florida Statutes (2020), which states:

(1) There is created a cause of action for an injunction for protection against domestic violence.

(a) Any person described in paragraph (e), who is either the victim of domestic violence as defined in s. 741.28 or has

5

reasonable cause to believe he or she is in imminent danger of becoming the victim of any act of domestic violence, has standing in the circuit court to file a sworn petition for an injunction for protection against domestic violence.

The definition of domestic violence in section 741.28(2), Florida Statutes (2020), includes "any . . . stalking." *See Lopez v. Lopez*, 922 So. 2d 408, 410 (Fla. 4th DCA 2006). Section 784.048, Florida Statutes defines stalking as the "willful[], malicious[], and repeated[] follow[ing], harass[ing], or cyberstalk[ing of] another person." *Id.* at 410. Section 784.048(1) also defines the components of stalking as follows:

(a) "Harass" means to engage in a course of conduct directed at a specific person which causes substantial emotional distress to that person and *serves no legitimate purpose.*

. . . .

(d) "Cyberstalk" means:

1. To engage in a course of conduct to communicate, or to cause to be communicated, words, images, or language by or through the use of electronic mail or electronic communication, directed at a specific person; or

. . . .

causing substantial emotional distress to that person and *serving no legitimate purpose.*

(emphasis added). In turn, the statute defines a "course of conduct" as "a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose." § 784.048(1)(b), Fla. Stat. (2020). In order to be entitled to a stalking injunction two separate instances of stalking must be proven by competent substantial evidence. *Burns v. Bockorick*, 220 So. 3d 438, 440 (Fla. 4th DCA 2017).

Appellant contends that the court erred in finding that appellee proved that appellant engaged in stalking, because appellee failed to show that appellant's conduct served no legitimate purpose, an essential element of the statutory definition of stalking by harassment or by cyberstalking. *See* § 784.048(1)(a) and (1)(d), Fla. Stat. (2020). He claims that his conduct did serve a legitimate purpose by reporting potential criminal activity or activity that could endanger other individuals, including at the hospital

6

where appellee was employed, appellee's neighbor, members of appellee's gym, and other individuals associated with appellee. Appellee responds that because the trial court found appellant's testimony not credible, the court implicitly found that appellant's conduct served no legitimate purpose.

"Whether the purpose for contact is 'legitimate' is evaluated on a case-by-case basis and the term 'legitimate' seems to be lacking a precise definition. However, courts have generally held that contact is legitimate when there is a reason for the contact other than to harass the victim." *O'Neill v. Goodwin*, 195 So. 3d 411, 413 (Fla. 4th DCA 2016); *see also Cash v. Gagnon*, 306 So. 3d 106, 110 (Fla. 4th DCA 2020). "[W]hether a communication serves a legitimate purpose is broadly construed and will cover a wide variety of conduct." *David v. Textor*, 189 So. 3d 871, 875 (Fla. 4th DCA 2016) (citations omitted). A finding of "no legitimate purpose" for an action "must not only comport with common sense, it must also be evidenced by a complete lack of usefulness or utility." *Logue v. Book*, 297 So. 3d 605, 614 (Fla. 4th DCA 2020) (citing *David*, 189 So. 3d at 875).

The legitimate purpose does not have to be the only purpose. In *Gonzalez v. Funes*, 300 So. 3d 679 (Fla. 4th DCA 2020), we considered a domestic violence injunction in which the parties involved were part of a love triangle of a former girlfriend, a boyfriend, and the current girlfriend, Gonzalez. The former girlfriend obtained a domestic violence injunction against Gonzalez who, in addition to other conduct, had gone to the former girlfriend's workplace and accused her of money laundering. Gonzalez had worked in real estate and believed that the former girlfriend's actions, in particular a real estate transaction involving the boyfriend, were suspicious. We found, "[a]lthough Gonzalez may have had ulterior motives for contacting [the former girlfriend's] employer, her contact with them was not entirely bereft of a legitimate purpose." *Id.* at 683. In other words, there was a reason for the contact with the employer other than to harass the girlfriend.

In this case, the court found appellant not to be credible, but it paired its finding of lack of credibility with a statement that it did not believe that appellant's motives were "pure." But appellant's reasons do not have to be pure *if* the communication with third parties served some legitimate purpose. Here, several of the communications did serve a legitimate purpose. Appellant filed a formal complaint with appellee's employing hospital, reciting the information he found on the laptop of matters which might show various illegal or unethical acts committed by appellee during his employment. Certainly, this is information which his employer needs to investigate. It serves the purpose of protecting the hospital and its

7

patients.  Appellant's formal complaint and delivery of his laptop to the police serves a legitimate purpose of reporting suspected criminal activity. "A report to an arm of government, concerning a matter within the purview of the agency's responsibilities, serves a 'legitimate purpose' within the meaning of section 784.048(1)(a), regardless of the subjective motivation of the reporter." *Curry v. State*, 811 So. 2d 736, 741 (Fla. 4th DCA 2002). In addition, appellant's filing of a complaint with the gym regarding photos he allegedly found of gym members on the laptop also serves a legitimate purpose in alerting the gym to a violation by appellee of gym policies.

The trial court's finding that appellant lacked credibility does not change this conclusion.  That appellant reported to the police, the hospital, and the gym is undisputed.  Only the motive was in dispute.  And as noted in *Gonzalez*, a contact can serve a legitimate purpose even if there was an ulterior motive for that contact.

But in this case, appellant also contacted neighbors and friends and advised them of what was termed appellee's "criminal conduct" as well as the possibility of hidden listening devices in appellee's home.  Because the trial court believed that appellant was not credible, we cannot conclude that these too served any legitimate purpose.  The court may not have believed that there were any hidden recording devices or that any of the friends contacted by appellant were in danger because of them.  No evidence was presented that the friends had any reason to know of appellant's suspicions of criminal conduct.  Thus, we conclude competent substantial evidence showed these contacts served no legitimate purpose.

As to the contact with appellee's friends, appellant also claims that appellee failed to prove that it caused him substantial emotional distress or that it constituted a threat of imminent violence.  He notes that appellee never testified that he was in distress.  However, "[w]hether a communication causes substantial emotional distress should be narrowly construed" and based on a reasonable standard. *David*, 189 So. 3d at 875 (citing *Bouters v. State*, 659 So. 2d 235, 238 (Fla. 1995); *Goudy v. Duquette*, 112 So. 3d 716, 717 (Fla. 2d DCA 2013)).  "[T]he standard is that of a reasonable person in the same position as the victim." *Johnstone v. State*, 298 So. 3d 660, 665 (Fla. 4th DCA 2020) (quoting *T.B. v. State*, 990 So. 2d 651, 654–55 (Fla. 4th DCA 2008)).  "[T]he standard is case specific." *David*, 189 So. 3d at 876 n.1.  "[I]n determining whether an incident or series of incidents creates substantial emotional distress . . . should be judged not on a subjective standard (was the victim in tears and terrified), but on an objective one (would a reasonable person be put in distress when subjected to such conduct?)." *Cash v. Gagnon*, 306 So. 3d 106, 110 (Fla. 4th DCA 2020) (quoting *D.L.D. v. State*, 815 So. 2d 746, 748 (Fla. 5th DCA 2002)).

And as to whether there must be proof of an imminent threat of violence, proof of recent stalking can be sufficient to establish the act of "violence" required for the issuance of a section 741.30(1)(a) domestic violence injunction. *Branson v. Rodriguez-Linares*, 143 So. 3d 1070, 1072–73 (Fla. 2d DCA 2014).

We conclude that the communications with the neighbor advising her to stay away and to keep her son away from appellee, as well as contacting other friends to warn them of listening devices, suspected criminal conduct of appellee, and suspicions of misbehavior at appellee's workplace would warrant a reasonable person to be put in substantial emotional distress over such conduct. This amounts to more than annoyance or embarrassment and is sufficient to establish the element of distress necessary for stalking.

Finally, appellant challenges the terms of the injunction which prohibit contact with third parties about appellee. He claims that this amounts to a prior restraint in violation of the First Amendment. The final judgment provided that "Respondent shall not contact or have any third party contact anyone connected with Petitioner's employment or school to inquire about Petitioner or to send any messages to Petitioner." We agree that a domestic violence injunction cannot act as a prior restraint on speech.

In *David v. Textor*, we addressed the question of whether the injunction for protection against violence violated the First Amendment. We explained that an injunction directed at speech is a "classic example of prior restraint on speech triggering First Amendment concerns." 189 So. 3d at 876 (quoting *Vrasic v. Leibel*, 106 So. 3d 485, 486 (Fla. 4th DCA 2013)). Further,

> An injunction may not be directed to prevent defamatory speech. [*Vrasic*, 106 So. 3d] at 487; *Chevaldina*, 133 So. 3d at 1090. " '[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.' " *Concerned Citizens for Judicial Fairness, Inc. v. Yacucci*, 162 So. 3d 68, 73 (Fla. 4th DCA 2014) (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976)). Section 784.048 itself recognizes the First Amendment rights of individuals by concluding that a "course of conduct" for purposes of the statute does not include protected speech. § 784.048(1)(b), Fla. Stat. (2014). This includes speech that may be offensive or vituperative.

9

> *See Watts v. U.S.*, 394 U.S. 705, 708, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969).

*Id.* Although David was engaged in posting material on the internet, we concluded that the injunction was a prior restraint infringing upon his First Amendment rights because:

> The injunction prevents not only communications *to* Textor, but also communications *about* Textor. Such prohibition by prior restraint violates the Constitution. If David's communications about Textor are defamatory, then Textor can sue David for damages.

*Id.*

To the extent that the language of the final injunction may prevent appellant from speaking *about* appellee to his employer, the injunction constitutes a prior restraint and violates the First Amendment. As in *David v. Textor*, if appellant's communications to the employer are defamatory, appellee can sue appellant. As to other third parties, such as the police, the injunction as written does not in any way prohibit appellant from communicating with other persons or entities *about* appellee.

For the foregoing reasons, we affirm the final judgment of injunction for protection against domestic violence, except as to the prior restraint in contacting appellee's employer about appellee.

*Affirmed in part; reversed in part.*

DAMOORGIAN, J., and ROBINSON, MICHAEL, Associate Judge, concur.

*     *     *

**Not final until disposition of timely filed motion for rehearing.**